# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

------------------------------------------------------------ x

In re:                                          :       Chapter 11
                                                :
F-STAR SOCORRO, L.P., *et al.*,                 :       Case No. 25-90607 (ARP)
                                                :
                              Debtors. [1]      :       Jointly Administered
                                                :
                                                :
------------------------------------------------------------ x

### DEBTORS' <u>EMERGENCY</u> MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS TO (A) OBTAIN POSTPETITION SECURED FINANCING AND (B) USE CASH COLLATERAL; (II) GRANTING LIENS AND PROVIDING CLAIMS WITH SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (III) GRANTING ADEQUATE PROTECTION TO THE PREPETITION SECURED PARTIES; AND (IV) GRANTING RELATED RELIEF

> **Emergency relief has been requested. Relief is requested not later than 11:00 a.m. (prevailing Central Time) on November 6, 2025.**
>
> **If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**
>
> **A hearing will be conducted on this matter on November 6, 2025, at 11:00 a.m. (prevailing Central Time) in Courtroom 400, 515 Rusk, Houston, TX 77002.**
>
> **Participation at the hearing will only be permitted by an audio and video connection.**
>
> **Audio communication will be by use of the Court's dial-in facility. You may access the facility at 832-917-1510. Once connected, you will be asked to enter the conference room number. Judge Pérez's conference room number is 282694. Video communication will be by use of the GoToMeeting platform. Connect via the free GoToMeeting application or click the link on**

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are F-Star Socorro, L.P. (7438); Five Star Development Properties, LLC (2183); Five Star Development Resort Communities, LLC (1282); Five Star Resort Holdings Parent, LLC (N/A); Five Star Resort Holdings, LLC (N/A); Five Star Resort Mezz, LLC (N/A); Five Star Resort Owner, LLC (4994); Five Star Land Holdings Parent, LLC (N/A); Five Star Land Holdings (AZ), LLC (N/A); Five Star Land Mezz, LLC (N/A); Five Star Land Owner, LLC (N/A); FSPV Mezz C Sub LLC (5233); FSPV Res C, LLC (8745); 11751 Alameda Avenue Owner, LLC (2300); JNY Building Owner, LLC (6282); JNY II Building Owner, LLC (9687); 1340 Bob Hope Drive Owner, LLC (4986); JNY, L.P. (3609); JNY II, L.P. (3041); 5 Star Tech I, L.P. (4020); 5 Star Tech II-1, LP (5916); 5 Star Tech II-4, LP (2357); 5-Star Tech II-2, L.P. (6602); F-Star Socorro Holding Co., LLC (6729); JNY Mezz, LLC (N/A); JNY II Mezz, LLC (N/A); 5 Star Tech I GP, LLC (N/A); 5 Star Tech II-1 GP, LLC (N/A); 5 Star Tech II-4 GP, LLC (N/A); 1340 Bob Hope Drive Parent, LLC (N/A); 11751 Alameda Avenue Parent, LLC (N/A); Unit 82 El Paso Owner, LLC (2399); Southwest Rojas Parent, LLC (N/A); and Southwest Rojas, LLC (N/A). The Debtors' mailing address in these chapter 11 cases is 6720 N. Scottsdale Rd., #130, Scottsdale, AZ 85253.

> **Judge Pérez's home page. The meeting code is "Judge Pérez". Click the settings icon in the upper right corner and enter your name under the personal information setting.**
>
> **Hearing appearances must be made electronically in advance of both electronic and in-person hearings. To make your appearance, click the "Electronic Appearance" link on Judge Pérez's homepage. Select the case name, complete the required fields, and click "Submit" to complete your appearance.**

F-Star Socorro, L.P. and its affiliated debtors and debtors in possession (collectively, the "**Debtors**") hereby submit this motion (the "**Motion**") seeking an interim order, substantially in the form attached hereto (the "**Interim Order**") as **Exhibit A**, (i) authorizing the Debtors to (a) obtain postpetition secured financing and (b) use cash collateral; (ii) granting liens and providing claims with superpriority administrative expense status; (iii) granting adequate protection to the prepetition secured parties; and (iv) granting related relief. In support of this Motion, the Debtors rely on and incorporate by reference the *Declaration of Lance Miller in Support of Debtors' Emergency Motion for Entry of Interim and Final Orders (i) Authorizing Debtors to (a) Obtain Postpetition Secured Financing and (b) Use Cash Collateral; (ii) Granting Liens and Providing Claims with Superpriority Administrative Expense Status; (iii) Granting Adequate Protection to the Prepetition Secured Parties; and (iv) Granting Related Relief* (the "**DIP Declaration**"), filed concurrently with this Motion. In further support of the Motion, the Debtors, by and through their undersigned proposed counsel, respectfully represent:

## <u>EXECUTIVE SUMMARY</u>

1.     The Debtors seek approval for a total commitment of up to $30 million in debtor-in-possession financing. The DIP Loan (as defined below) will be funded in multiple tranches. Upon entry of the Interim Order, the DIP Borrowers (as defined below) may draw up to $6 million (the "**Initial Draw**"), which will be immediately available to address liquidity needs and preserve the value of the DIP Borrowers' (as defined below) estates. Upon the Initial Draw, the DIP Lender (as defined below) will receive a fully perfected *junior* security interest in certain

of the Debtors' real property, including (i) junior liens on commercial properties located in El Paso, Texas and (ii) junior liens on certain properties that constitute the 122-acre ultra-luxury mixed-use development project that will be anchored by The Ritz-Carlton, Paradise Valley (the "**Ritz-Related Properties**"). *The Debtors are not seeking to prime any prepetition secured lender in the interim period*.

        2.      On a final basis, the Debtors seek a final order (the "**Final Order**") granting (i) an additional $24 million in debtor-in-possession financing (the "**Additional Draws**"), and (ii) the DIP Lender (as defined below) senior, priming liens (the "**DIP Priming Liens**") on the Ritz-Related Properties, which will prime all existing and future liens or security interests on such properties. The Debtors will supplement this Motion with additional evidence in support of the DIP Priming Liens and will provide the United States Bankruptcy Court for the Southern District of Texas (the "**Court**") and parties in interest with a description of the funds required for the post-interim period and the basis for such relief.

        3.      The DIP Facility (as defined below) represents an essential source of postpetition financing that will enable the Debtors to maintain operations, preserve enterprise value, and pursue an orderly restructuring process. The proposed terms reflect the result of good-faith, arm's-length negotiations with the DIP Lender (as defined below). Approval of the DIP Facility (as defined below) will ensure that the Debtors have the necessary liquidity to stabilize their business, protect their assets, and maximize recoveries for the benefit of all stakeholders.

## RELIEF REQUESTED

4.      The Debtors respectfully request entry of an Interim Order and Final Order granting the following relief:[2]

i.      authorizing the Debtors (the **"DIP Borrowers"**) to obtain a senior secured superpriority postpetition debtor-in-possession loan in an aggregate amount of up to $30,000,000 (the **"DIP Facility"** and the loans made pursuant thereto, the **"DIP Loans"**), pursuant to the terms and subject to the conditions of the DIP term sheet (as the same may be amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time subject to the terms set forth in the Interim Order, the **"DIP Term Sheet"**), a copy of which is attached as **Exhibit 1** to the Interim Order, among the DIP Borrowers and Sandton Capital Solutions Master Fund VI, LP (the **"DIP Lender"**);

ii.     authorizing the Debtors to (x) execute, deliver and perform their respective obligations under (a) the DIP Term Sheet and (b) any other agreements, instruments, pledge agreements, mortgages, guarantees, security agreements, intellectual property security agreements, control agreements, financing statements, notes, and documents related thereto, in each case, as amended, restated, amended and restated, supplemented, waived or otherwise modified from time to time in accordance with the terms thereof and hereof (each a **"Loan Document"** (as defined in the DIP Term Sheet)) (collectively, together with the DIP Term Sheet, the Interim Order and, upon entry thereof, the Final Order, the **"DIP Documents"**);

iii.    authorizing the Debtors to incur and guarantee loans, advances, extensions of credit, financial accommodations, reimbursement obligations, fees, costs, expenses, other liabilities, and all other obligations (including indemnities and similar obligations, whether contingent or absolute) up to $6,000,000 during the interim period due or payable under, or secured by, the DIP Documents (collectively, the **"DIP Obligations"**);

iv.     authorizing and directing the Debtors to use their cash and the proceeds of the DIP Facility solely in accordance with the budget, to pay operating expenses, administrative expenses, and other corporate purposes;

v.      granting to the DIP Lender and authorizing the Debtors to incur legal, valid, enforceable, non-avoidable, and automatically and fully perfected DIP Liens (as defined below) in all DIP Collateral (as defined below) to secure the DIP Obligations, which DIP Liens shall be subject to the Carve Out (as defined below);

---

[2] The Debtors will file the form of Final Order prior to the Final Hearing.

vi.    upon entry of the Final Order, waiving the Debtors' right to surcharge the DIP Collateral (as defined below) pursuant to section 506(c) of the Bankruptcy Code,

vii.   waiving (a) the "equities of the case" exception under section 552(b) of the Bankruptcy Code, upon entry of the Final Order, and (b) the equitable doctrine of "marshaling" and other similar doctrines with respect to the DIP Collateral (as defined below) for the benefit of any party other than the DIP Lender;

viii.  modifying or vacating the automatic stay imposed by section 362 of the Bankruptcy Code or otherwise to the extent necessary to implement and effectuate the terms and provisions set forth in this Interim Order and in the DIP Documents, and waiving any applicable stay (including under Bankruptcy Rule 6004) with respect to the effectiveness and enforceability of this Interim Order, and providing for the immediate effectiveness of this Interim Order;

ix.    scheduling a final hearing (the **"Final Hearing"**) to consider entry of a Final Order authorizing and approving, among other things, the relief requested in the Motion on a final basis, which order shall be in form substantially similar to the Interim Order and otherwise reasonably acceptable in form and substance to the Debtors and the DIP Lender and approving the form of notice with respect to the Final Hearing; and

x.     granting related relief.

## JURISDICTION AND VENUE

5.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the Order of Reference to Bankruptcy Judges from the United States District Court for the Southern District of Texas, entered May 24, 2012. This is a core proceeding pursuant to 28 U.S.C. § 157(b). The Debtors confirm their consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

6.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

7.     The bases for the relief requested herein are sections 105, 361, 362, 363, 364, 503, and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "**Bankruptcy Code**"), rule 2002 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), rules

2002-1, 4001-1, 4002-1, and 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "**Bankruptcy Local Rules**"), and the Procedures for Complex Cases in the Southern District of Texas (the "**Complex Case Procedures**").

## BACKGROUND

8.      On November 4, 2025 (the "**Petition Date**"), each of the Debtors filed a voluntary petition with this Court for relief under chapter 11 of the Bankruptcy Code. The Debtors continue to manage and operate their businesses as debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code.

9.      The Debtors own and operate a diversified portfolio of commercial real estate properties, including hotel, retail, office, and industrial properties. Within the Debtors' portfolio is a 122-acre ultra-luxury mixed-use development located at the border of Paradise Valley and Scottsdale, Arizona (the "**Project**"). The Project integrates world-class hospitality, residential, and retail experiences, anchored by The Ritz-Carlton, Paradise Valley. Upon completion, the Project is expected to be a premier destination, consisting of three principal components: (i) a newly-constructed 215-room ultra-luxury resort that will be managed by The Ritz-Carlton Hotel Company, LLC, a subsidiary of Marriott International Estate upon completion; (ii) luxurious private residences, consisting of 80 Ritz-Carlton-branded Villas—all pre-sold—and 32 high-end estate homes, several of which are occupied, under construction, or under contract within the 12-acre resort enclave; and (iii) a fully entitled 29-acre site planned for development as a luxury retail and mixed-use district featuring high-end retail, dining, and experiential offerings, with luxury tenants, and a nine-acre parcel designated for future development of luxury condominiums in partnership with globally recognized design houses.

10.      The Debtors also own and operate multiple commercial and industrial properties in El Paso, Texas (the "**Commercial Properties**"). These properties generally are

financed by secured lenders in varying amounts, though significant equity value demonstrably exists in these properties. The Debtors propose to utilize this equity as collateral security for the DIP Facility in the form of second priority liens.

11.     Additional information on the Debtors' businesses and capital structure, as well as a description of the reasons for filing these cases, is set forth in the *Declaration of Lance Miller in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings*.

**CONCISE STATEMENT PURSUANT TO BANKRUPTCY RULE 4001 AND THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF TEXAS PROCEDURES FOR COMPLEX CHAPTER 11 CASES[3]**

12.     The following chart contains a summary of the material terms of the proposed DIP Facility, together with references to the applicable sections of the relevant source documents, as required by Bankruptcy Rules 4001(b)(1)(B) and 4001(c)(1)(B) and the Complex Case Procedures.

| Bankruptcy Rule | Relief Requested |
|---|---|
| **Parties to the DIP Facility**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | <u>DIP Borrowers</u>: F-Star Socorro, L.P. and each of its affiliates that are debtors and debtors-in-possession in these chapter 11 cases (the "**Chapter 11 Cases**").<br><br><u>DIP Lenders</u>: Sandton Capital Solutions Fund VI, LP and/or one or more of its affiliated funds and accounts.<br><br>DIP Term Sheet at 1. |
| **Use of Proceeds**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | The DIP Loans will be available to the DIP Borrowers to fund operating expenses, restructuring costs, professional fees, case administration costs, and other general corporate purposes as set forth in a budget prepared by the DIP Borrowers.<br><br>DIP Term Sheet at 1. |

---

[3] The summaries contained in this Motion are qualified in their entirety by the provisions of the documents referenced, including the DIP Term Sheet, and the Interim Order. To the extent anything in this Motion is inconsistent with such documents, the terms of the applicable documents shall control. Capitalized terms used in this summary chart but not otherwise defined have the meanings ascribed to them in the DIP Documents or the Interim Order, as applicable.

| DIP Facility<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | The Debtors are authorized to enter into, be bound by, and perform under the DIP Documents and to borrow up to $30,000,000, provided that disbursements of such amount are in accordance with the DIP Documents.<br><br>Upon entry of the Interim Order, the Debtors shall be authorized to make an initial draw in the aggregate principal amount of $6,000,000 (the "**Initial Draw**"). The remaining balance of the DIP Loan Amount, up to an aggregate principal amount of $24,000,000, shall be available to the Debtors in one or more subsequent draws, subject to the terms and conditions set forth in the DIP Term Sheet and the entry of the Final Order by the Court.<br><br>*See* Interim Order at 2; DIP Term Sheet at 1–2. |
| --- | --- |
| Interest Rates<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | The principal amount advanced and outstanding under the DIP Facility shall accrue interest at a per annum rate equal to 15% paid-in-kind (the "**Interest Rate**").<br><br>*See* DIP Term Sheet at 3.<br><br>After the occurrence and during the continuance of an Event of Default, to the extent permitted by applicable law, the principal balance advanced and outstanding shall bear interest at a rate per annum that is three percentage points (3.0%) above the Interest Rate.<br><br>*See* DIP Term Sheet at 4. |
| Maturity Date<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | DIP Lender will be entitled to immediate repayment of all outstanding obligations under the DIP Loan on the earliest of (collectively, the "**Repayment Date**"):<br><br>(a) the effective date of the plan of reorganization;<br><br>(b) closing on a sale of all or substantially all of the DIP Borrowers' assets (unless otherwise agreed to by the parties); provided that, in no event, shall any Residence Sale trigger the Repayment Date; and<br><br>(c) 12 months from the date of origination, subject to extension as set forth below (for a total of up to 15 months from the date of origination).<br><br>*See* DIP Term Sheet at 3. |
| Conditions Precedent to Closing and Lending<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | The Initial Draw will be available on the entry of the Interim Order approving the DIP Loan.<br><br>*See* DIP Term Sheet at 2.<br><br>Other than the Initial Draw that will be documented solely by the DIP Term Sheet, the DIP Loan will be documented by, among other things, a promissory note, security and credit agreement, all of which will be subject to Court approval. Additional Draws are subject to such documents and Court approval and entry of the Final Order.<br><br>*See* DIP Term Sheet at 2, 9. |
| Events of Default<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | The DIP Term Sheet contemplates that the credit agreement will include customary events of default for financings of this type and other events of default agreed to by the Debtors and the DIP Lenders.<br><br>*See* DIP Term Sheet at 7; Interim Order at 28–29. |

| | |
|---|---|
| **Carve-Out**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | The Interim Order provides a "**Carve Out**" (as defined in the Interim Order) of certain statutory fees and allowed professional fees of the Debtors pursuant to sections 327, 328, 363, and/or 1103 of the Bankruptcy Code.<br><br>*See* Interim Order at 16–17. |
| **Priority of Claims and Liens; Collateral**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(i)* | <u>DIP Superpriority Claims.</u> The DIP Lender, on account of all of the DIP Obligations, will be granted allowed superpriority administrative expense claims against the Debtors on a joint and several basis with priority over any and all claims against each of the Debtors, which shall be payable from and have recourse to all DIP Collateral, subject only to the liens on such property and the Carve Out.<br><br>*See* Interim Order at 19–20.<br><br><u>DIP Liens.</u> As security for the DIP Obligations, the DIP Lender shall be granted junior, continuing, valid, binding, enforceable, nonavoidable, and automatically and properly perfected security interests (the "**DIP Liens**") on all DIP Collateral, subject to the priorities in this Interim Order as collateral security for the prompt and complete performance and payment when due of all DIP Obligations.<br><br>*See* Interim Order at 20–22.<br><br><u>DIP Collateral.</u> Upon entry of the Interim Order, the DIP Collateral shall consist of fully perfected junior security interest in the Joe Battle Property, 11751 Alameda Property, Ritz-Related Properties, Alameda Properties, and ancillary collateral appurtenant to the properties as described in the Interim Order. Upon entry of the Final Order, the DIP Collateral shall include a priority senior priming security interest in and liens upon the Ritz-Related Properties (the "**DIP Priming Liens**"), which DIP Priming Liens shall prime in all respects the interests of any prepetition party asserting any current or future liens or interests in the Ritz-Related Properties.<br><br>*See* DIP Term Sheet at 4–6; Interim Order at 20–21.<br><br><u>Supplemental Collateral.</u> Upon entry of the Interim Order, non-debtors F-Star Buckeye Rd LLC and Buckeye Building Owner LLC shall grant a fully perfected junior security interest in the real property located at 8585 W Buckeye Rd., Tolleson, AZ 85353-9222 to DIP Lender. If the Final Order authorizing the DIP Priming Liens is not entered on or before 45 days from the Petition Date, then DIP Lender will record such mortgage.<br><br>*See* DIP Term Sheet at 6. |
| **Adequate Protection / Identity of Each Entity with Interest in Cash Collateral**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(ii); (b)(1)(B)(i), (iv)* | Madison and Corebridge are entitled, pursuant to sections 361, 362, 363(e), and 507 of the Bankruptcy Code, to adequate protection of their respective interests in the applicable prepetition collateral solely in the diminution in the value of their respective interests in the Prepetition Loan Property from and after the Petition Date. The adequate protection includes the Madison 507(b) Claims, Corebridge 507(b) Claims, continued interest payments for Corebridge, and maintenance of purported collateral.<br><br>*See* Interim Order at 24–27. |
| **Waiver or Modification of Automatic Stay**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(iv)* | The automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby modified as necessary to effectuate all of the terms and provisions of this Interim Order,<br><br>*See* Interim Order at 27–28. |

| | |
|---|---|
| | During the continuation of a DIP Termination Event and following the delivery of the DIP Termination Notice, but before exercising the remedies set forth in the DIP Term Sheet or any other remedies, the DIP Lender shall be required to file a Stay Relief Motion on not less than five (5) business days' notice to the Remedies Notice Parties (which may run concurrently with the Default Notice Period) for a further order of the Court modifying the automatic stay in the Chapter 11 Cases to permit the DIP Lender to—subject to the Carve Out, Madison Lien, Corebridge Lien, and any valid, enforceable, and timely and properly perfected mechanics' liens (i) that were perfected prior to the Petition Date, or (ii) that are timely and properly perfected postpetition solely by the giving of notice under 11 U.S.C. § 546(b) (any such liens, "**Valid Mechanics' Liens**")—exercise its remedies under the DIP Term Sheet.<br><br>*See* Interim Order at 29. |
| **Release**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(x)* | The DIP Lender shall be released by the Debtors and their respective estates (including any successor trustee or other estate representative in these Chapter 11 Cases or any successor cases) pursuant to release provisions ordinary and customary for financings of this type.<br><br>*See* Interim Order at 6–7. |
| **Indemnification**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(ix)* | The DIP Lender shall be indemnified and held harmless by the Debtors in respect of any claim or liability incurred in respect thereof or in any way related to the DIP Facility as and to the extent provided in the DIP Documents.<br><br>*See* Interim Order at 5–6. |
| **Section 506(c) Waiver / Section 552(b) Waiver**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(x)* | Upon entry of the Final Order, the right to surcharge the DIP Lender's collateral under Section 506(c) of the Bankruptcy Code is waived, and the DIP Lender shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code—in no event shall the "equities of the case" exception in section 552(b) of the Bankruptcy Code apply.<br><br>*See* Interim Order at 30–31. |
| **Fees**<br><br>*Fed. R. Bankr. P. 4001(c)(1)* | The DIP Loan interest rates and fees will be as follows:<br><br>• <u>Issuance Fee</u>: The DIP Borrowers will pay DIP Lender an issuance fee of 1.50% of the amount of the Initial Draw and each Additional Draw, which fee will be earned and payable on the date of each draw (the issuance fee will be capitalized and added to the Funded Amount but not counted against draw limits).<br><br>• <u>Cash Interest</u>: None.<br><br>• <u>PIK Interest</u>: The DIP Borrowers will pay the DIP Lender PIK interest at 15.0% per annum on the outstanding Funded Amount, which shall be added to the Funded Amount on a monthly basis but not counted against draw limits for any of the draws contemplated under the DIP Term Sheet.<br><br>• <u>Exit Fee</u>: The DIP Borrowers will pay the DIP Lender an exit fee of 2.0% multiplied by the Funded Amount. Such exit fees will be payable on the earlier to occur of any Prepayment Date and Repayment Date. If Lender chooses to roll the DIP Loan into a proposed exit financing, such exit fee will be waived. |

|  | • Default Interest Rate: During the occurrence and continuance of an Event of Default, the PIK interest rate will increase by 3.0%. |
|  | • Renewal Fees: If the DIP Loan is not repaid in full on or before the Repayment Date, time being of the essence, the Borrowers will pay to the Lender, in addition to all other fees and other amounts as set forth in the DIP Term Sheet, a renewal fee of 2.0% of the Total Principal Amount as of the Repayment Date, which shall extend the Repayment Date by an additional 3 months (the Renewal Fee will be capitalized and added to the Funded Amount at the time of extension, but, if applicable, will not count against draw limits). Borrowers shall be entitled to no more than one (1) 3-month extension period at the Repayment Date (based on mutually agreed operating and restructuring milestones). |
|  | • Unused Fee: Effective upon the entry of the Final Order, the DIP Borrowers thereafter will pay the Lender an unused fee at 2.0% per annum on the undrawn outstanding Total Principal Amount, which shall be added to the Funded Amount on a monthly basis and will not count against draw limits for any of the draws contemplated herein. |
|  | • Minimum Multiple of Invested Capital: The DIP Borrowers will pay the Lender a cash fee at exit such that the Lender's multiple of invested capital for each advance (the Initial Advance and each Additional Advance individually), exclusive of any fees, shall be no less than 1.15x. |
|  | *See* DIP Term Sheet at 3–4. |

## **STATEMENT REGARDING SIGNIFICANT PROVISIONS**[4]

13.     The Interim Order contains certain of the provisions (the "**Significant Provisions**") identified on **Exhibit B** to the Complex Case Procedures as summarized above. Importantly, however, the DIP Lender is not a prepetition creditor of the Debtors and as a result, neither the instant Motion nor the Interim or Final Order seeks to modify any pre-petition debts of the DIP Lender.

---

[4] Significant Provisions refer to those provisions that contain: (a) sale or plan confirmation milestones; (b) cross collateralization; (c) roll ups; (d) liens on avoidance actions or proceeds of avoidance actions; (e) default provisions and remedies that are self-executing or preclude court oversight, including: (i) provisions terminating the automatic stay without further order, (ii) provisions waiving rights to challenge lenders' ability to exercise post-default remedies, and (iii) provisions limiting required proof or altering the burden of proof at post-default hearings; (f) releases of claims; (g) limitations on the use of cash collateral or DIP proceeds (other than general "carve outs") to pay approved fees and expenses of advisors to official committees or future trustees; (h) nonconsensual priming liens; or (i) any other provision that limits the ability of estate fiduciaries to fulfill their duties under the Bankruptcy Code and applicable law. *See* Complex Rules ¶ 8.

14.     The Interim Order grants junior secured liens and administrative expense claims to the DIP Lender, subject to the Carve Out, Madison Lien (as defined below), the Corebridge Lien (as defined below), and Valid Mechanics' Liens.

15.     For the reasons set forth below, the Debtors submit that the Significant Provisions are appropriate under the facts and circumstances of these Chapter 11 Cases and have been narrowly tailored to the DIP Facility. Accordingly, the Significant Provisions in the Interim Order should be approved.

## PREPETITION CAPITAL STRUCTURE

16.     As of the date of the filing of the petition (the **"Petition Date"**), the Debtors have approximately $644.6 million in total funded debt obligations.

*a)  The Madison Loan*

17.     Debtors Five Star Resort Owner, LLC, Five Star Land Owner, LLC, FSPV Res C, LLC, Unit 82 El Paso Owner, LLC, F-Star Socorro, L.P., JNY Building Owner, LLC, JNY II Building Owner, LLC, 1340 Bob Hope Drive Owner, LLC, and 11751 Alameda Avenue Owner, LLC are party to that certain Construction Loan Agreement (as modified, supplemented, or amended from time to time, the  **"CLA"**), dated May 11, 2023, with RC PV Lender I LLC, a single-purpose vehicle affiliated with Madison Realty Capital L.P. (collectively, **"Madison"**).

18.     The obligations under the CLA are purportedly secured (the **"Madison Lien"**)[5] by (x) five land parcels located at 7000 East Lincoln Drive, Paradise Valley, Arizona 85253, which include the Palmeraie Scottsdale, Palmeraie Paradise Valley, Ritz-Carlton Resort, Ritz-Carlton Villas, and Ritz-Carlton Estate Lots, all as more particularly described in the CLA

---

[5] The Debtors have not investigated the validity, perfection, priority or enforceability of the Madison Lien, and reserve the right to do so.

(*i.e.* the Ritz-Related Properties) and (y) real property located at (i) 1340 Bob Hope Drive, El Paso, Texas 79936; (ii) 11891 Alameda Avenue, El Paso, Texas 79927; (iii) 11801 Alameda Avenue, El Paso, Texas 79927; (iv) 11091 Alameda Avenue, El Paso, Texas; (v) 12183 Alameda Avenue, Clint, Texas 79836; and (vi) certain land parcels located at 11751 Alameda Avenue, Socorro, Texas 79927 (collectively, the "**Alameda Properties**").

19.     On May 21, 2025, based on largely undisclosed calculations, Madison claimed that the CLA had been fully funded and no funds remain to complete construction.

*b)  The Alameda Corebridge Loan*

20.     Debtor F-Star Socorro Holding Co., LLC is a party to that certain Loan Agreement, dated December 27, 2023 (the "**Alameda Corebridge Loan**"), with the lenders party thereto from time to time and Corebridge Financial, Inc. ("**Corebridge**") as successor administrative agent. The obligations under the Alameda Corebridge Loan are secured (the "**Alameda Lien**") by certain land parcels located at 11751 Alameda Avenue, El Paso, Texas 79927 (the "**11751 Alameda Property**").

*c)  The Joe Battle Corebridge Loan*

21.     Debtors 5 Star Tech I, L.P., 5 Star Tech II-1, LP, and 5 Star Tech II-4, LP are parties to that certain Loan Agreement, dated December 27, 2023 (the "**Joe Battle Corebridge Loan**") with the lenders party thereto from time to time and Corebridge**,** as successor administrative agent. The obligations under the Joe Battle Corebridge Loan are secured (the "**Joe Battle Lien**" and collectively, with the Alameda Lien, the "**Corebridge Lien**"[6]) by real property located at (i) 1273 Joe Battle Boulevard, El Paso, Texas; (ii) 1277 Joe Battle Boulevard, El Paso,

_____

[6] The Debtors have not investigated the validity, perfection, priority or enforceability of the Corebridge Lien, and reserve the right to do so.

Texas; (iii) 1281 Joe Battle Boulevard, El Paso, Texas; (iv) 1301 Joe Battle Boulevard, El Paso, Texas; (v) 1321 Joe Battle Boulevard, El Paso, Texas (collectively, the **"Joe Battle Property"**).

## THE DEBTORS' IMMEDIATE NEED FOR ACCESS TO THE DIP FACILITY

22.     The Debtors believe that to successfully reorganize under chapter 11, it is of paramount importance that they have immediate access to funds through DIP financing.

23.     The Debtors are a complex and sophisticated company, with the need for substantial professional support to ensure the smooth administration of chapter 11 proceedings. The complicated nature of the Debtors' legal and financial positions, the large number of creditors and parties in interest, and the myriad assets under various levels of encumbrance promise a challenging administrative process over the coming months while these Chapter 11 Cases are reconciled into a confirmation plan. In accordance with this fact, the professional support of bankers, lawyers, and other advisors will be the primary cost throughout the period that the Debtors' Chapter 11 Cases take to materialize into a successful confirmation plan. Debtors believe that the DIP facility outlined herein will be essential to satisfy the financial obligations that accompany the chapter 11 proceedings to come.

24.     The Debtors anticipate that the total costs of the professional assistance required in the first 7 weeks of these Chapter 11 Cases will be $6,524,515. As such, the Initial Draw of $6,000,000 will be vital to the funding of the Debtors' successful reorganization.

## ALTERNATIVE SOURCES OF FINANCING ARE NOT AVAILABLE ON BETTER TERMS

25.     As set forth in the DIP Declaration, the Debtors launched an extensive marketing process in an effort to identify the ideal solution for their postpetition financial needs. DIP Decl. ¶ 13. The Debtors, with the assistance of professionals at Pivot Group, began this marketing process by developing a list of sophisticated and knowledgeable institutions with an

14

understanding of the Debtors' business.  DIP Decl. ¶ 13. In creating this list, the Debtors also

considered which institutions would be most capable of providing postpetition financing quickly

and on terms most favorable to the Debtors.  DIP Decl. ¶ 13.  Following the compilation of a list

of eligible institutions, the initial outreach began by providing an overview of the requested DIP

loan facility to the identified institutions. DIP Decl. ¶ 13. The identified institutions were invited

to enter into a non-disclosure agreement to allow them to further investigate the financial position

of the Debtors. DIP Decl. ¶ 13.

26.     Of the twenty institutions contacted by the Debtors, thirteen signed non-

disclosure agreements. DIP Decl. ¶ 13. These parties were then given extensive access to materials

outlining the Debtors' financial circumstances, and negotiations between these institutions and the

Debtors commenced. DIP Decl. ¶ 14. Debtors requested that the institutions submit detailed

outlines of their proposed terms of the DIP financing arrangements, including, but not limited to,

structure, loan amount, timing, interest rate, fees, covenants, collateral, and use of proceeds. DIP

Decl. ¶ 15. A total of three institutions submitted these proposed terms. DIP Decl. ¶ 14. None of

the proposed terms offered by these institutions included offers of unsecured financing that would

satisfy section 364(a) or (b) of the Bankruptcy Code. DIP Decl. ¶ 16.

27.     After diligent negotiation and review of the proposals, the Debtors, in their

business judgment, determined that the terms proposed by Sandton Capital Solutions Fund IV, LP

were most favorable to the Debtors. DIP Decl. ¶ 15. Accordingly, the Debtors entered into

negotiations to finalize the terms of the DIP facility with the DIP Lender. DIP Decl. ¶ 15. The

proposed DIP Facility outlined herein is the result of these negotiations.

28.     It is the Debtors' belief that the proposed DIP Facility is the best financing

opportunity presently available to the Debtors. DIP Decl. ¶ 18. This belief is predicated on weeks

of substantial efforts by many experienced legal and financial professionals to acquire funding on the best terms possible. DIP Decl. ¶¶ 13–16.  It is further the Debtors' belief that the proposed DIP facility reflects commercially reasonable and customary terms that are more advantageous than any other terms proposed by institutions identified as potential lenders. DIP Decl. ¶ 18.

29.     Summarily, the Debtors, after extensive arm's-length negotiation and marketing, believe that the proposed DIP Facility represents the best terms available and offers the highest likelihood of successful reorganization under these Chapter 11 Cases.

### THE DEBTORS' PROPOSED USE OF PREPETITION CASH COLLATERAL

30.     Pursuant to this Motion, the Debtors also seek authorization for the continued use of "Cash Collateral."[7]

31.     The Debtors' access to sufficient liquidity is critical to the smooth and diligent administration of these Chapter 11 Cases. DIP Decl. ¶  10. As previously noted, the administration of these cases promises to be complex, and will indubitably require the substantial efforts of numerous professionals to ensure a well-ordered reorganization that protects the creditors and parties in interest, while providing the Debtors the fresh start promised by chapter 11. The expenses that accompany the administration of these cases, along with any expenses that may be authorized by this Court in response to other first day motions or motions later filed, may require the use of prepetition Cash Collateral. Without the ability to utilize that Cash Collateral, the Debtors (and by extension, any stakeholders) will suffer immediate and irreparable harm from the consequences of failing to meet their financial obligations related to the administration of this case.

---

[7] Cash Collateral shall have the meaning ascribed to it in section 363(a) of the Bankruptcy Code.

32.     The Debtors are providing an adequate protection package for Madison and Corebridge that will protect against diminution in value of their collateral in accordance with the requirements of section 363(c) of the Bankruptcy Code. If the Debtors are not allowed use of the Cash Collateral, they will likely be unable to operate and maintain the Commercial Properties and continue to develop the Project. Moreover, without the ability to use Cash Collateral, creditors asserting liens against their applicable prepetition collateral will be significantly harmed because the Debtors may have no choice but to liquidate their assets. Accordingly, the Debtors seek authority to use Cash Collateral for the benefit of all parties in interest and respectfully submit that use of Cash Collateral is (i) necessary to avoid the shutdown of the Debtors' business; and (ii) in the best interests of the Debtors, their estates, and their creditors as the Debtors reorganize their financial affairs.

## BASIS FOR RELIEF

**I.     The Debtors Should be Authorized to Obtain Postpetition Credit Through the DIP Documents.**

**A.     Entry into the DIP Documents is an Exercise of the Debtors' Sound Business Judgment.**

33.     The Court should authorize the Debtors, as an exercise of their sound business judgment, to enter into the DIP Documents, obtain access to the DIP Facility, and continue their use of Cash Collateral. Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority credit under certain circumstances discussed in detail below. *See generally* 11 U.S.C. § 364. Courts grant a debtor-in-possession considerable deference to act in accordance with its business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of the Bankruptcy Code or the policies that underlie it. *See, e.g.*, *In re N. Bay Gen. Hosp., Inc.*, No. 08-20368 (Bankr. S.D. Tex. July 11, 2008) (order approving postpetition financing on an interim basis as exercise of debtors'

business judgment); *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Latam Airlines Grp. S.A.*, 620 B.R. 722, 768 (Bankr. S.D.N.Y. 2020) ("Generally, in evaluating the merits of proposed postpetition financing, courts will defer to a debtor's business judgment provided that the financing does not unduly benefit a party in interest at the expense of the estate.").

34.     To determine whether the business judgment standard is met, a court need only "examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513-14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code" (footnotes omitted)).

35.     In considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender. *See In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003) (finding DIP terms that favored the DIP lenders to be reasonable when "taken in context, and considering the relative circumstances of the parties"); *see also In re Elingsen McLean Oil Co., Inc.*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into hard bargains to acquire funds for its reorganization).

36.     Access to the liquidity provided through the DIP Facility and Cash Collateral is critical in funding the initial stages of these Chater 11 Cases. As of the Petition Date, the Debtors' currently available cash on hand is approximately $287,455.49, which is insufficient to fund the administration of these Chapter 11 Cases while paying operating expenses related to

both the Project and Commercial Properties in the ordinary course as they come due before a final hearing can be held. DIP Decl. ¶ 8. As a result, the DIP Facility will allow the Debtors to continue to operate the Debtors' businesses while taking steps through these Chapter 11 Cases to improve operational results. DIP Decl. ¶¶ 8, 11.

37.     The Debtors negotiated the DIP Term Sheet with the DIP Lenders in good faith and at arm's length, and after conducting a marketing process, the Debtors believe they have obtained the best financing available under the circumstances. DIP Decl. ¶ 18. The DIP Facility provides the Debtors with market-tested postpetition financing on the best available terms and will allow the Debtors to continue operating their business. DIP Decl. ¶ 18. Accordingly, the Court should authorize the Debtors' entry into the DIP Documents, as it is a sound exercise of the Debtors' business judgment.

**B.     The Debtors Should Be Authorized to Grant Liens and Superpriority Claims to the DIP Lender.**

38.     The Debtors intend to grant superpriority claims, security interests, and liens as set forth in the DIP Documents pursuant to sections 364(c) of the Bankruptcy Code. Specifically, the Debtors propose to provide to the DIP Lenders superpriority claims in respect of DIP Obligations and continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected postpetition security interests in, and liens on, the DIP Collateral, subject to the Carve Out, Madison Lien, the Corebridge Lien, and Valid Mechanics' Liens.

39.     The Debtors propose to obtain financing under the DIP Facility, in part, by providing superpriority claims and liens pursuant to Section 364(c) of the Bankruptcy Code. DIP Decl. ¶ 16. Upon entry of the Interim Order, the Debtors only request that the DIP Lenders receive

perfected *junior* security interest in the Alameda Properties, Ritz-Related Properties, 11751 Alameda Property, and Joe Battle Property.[8] DIP Decl. ¶ 16.

40.    In the event that a debtor demonstrates that it is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, section 364(c) provides that a court:

> [M]ay authorize the obtaining of credit or the incurring of debt—
>
> > (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code];
> >
> > (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or
> >
> > (3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c); *see also In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (authorizing secured credit under section 364(c) of the Bankruptcy Code, after notice and hearing, upon showing that unsecured credit cannot be obtained). Courts have articulated a three-part test to determine whether a debtor is entitled to financing pursuant to section 364(c) of the Bankruptcy Code. Specifically, courts look to whether:

a.    the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code, *i.e.*, by allowing a lender only an administrative claim;

b.    the credit transaction is necessary to preserve the assets of the estate; and

c.    the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

---

[8] The Debtors will supplement this Motion with a request for the DIP Priming Liens, which shall prime in all respects the interests of any prepetition party asserting any current or future liens or interests in the Ritz-Related Properties, including Madison.

*See In re St. Mary Hosp.*, 86 B.R. 393, 401–02 (Bankr. E.D. Pa. 1988); *Crouse Grp.*, 71 B.R. at 549.

41. No party contacted as part of the above-described process was interested in providing, or willing to provide, postpetition financing to the Debtors on an unsecured basis. *See* DIP Decl. ¶ 16. Indeed, no constituency was willing to provide postpetition financing on anything other than a superpriority basis with respect to all of the Debtors' assets. The DIP Lender was not willing to provide the DIP Facility on any other terms. Accordingly, the DIP Facility's structure is appropriate in light of the Debtors' financing needs and the lack of viable debtor-in-possession financing alternatives.

**C.** **No Comparable Alternative to the DIP Facility Is Reasonably Available on More Favorable Overall Terms.**

42. To obtain credit under section 364, a debtor need only demonstrate "by a good faith effort that credit was not available without" the inducements offered to postpetition lenders. *In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992). Moreover, in circumstances where only a few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also In re Snowshoe Co.*, 789 F.2d at 1088. (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was

met); *In re Ames Dep't Stores*, 115 B.R. at 37 (explaining that a debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b)).

43.     The Debtors do not believe that more favorable alternative postpetition credit is reasonably available given the realities imposed by the Debtors' existing capital structure, and the Debtors' solicitation of alternative financing proposals confirmed that the only actionable option was the DIP Facility. DIP Decl. ¶ 16. Following arm's-length negotiations with potential lenders, the Debtors determined that the DIP Facility is the only actionable option to fund these Chapter 11 Cases. DIP Decl. ¶ 16. Simply put, the DIP facility provides the Debtors with the best postpetition credit available to pursue a value-maximizing restructuring. Therefore, the requirement of section 364 of the Bankruptcy Code that alternative credit on more favorable terms be unavailable to the Debtors is satisfied.

## II.     The Adequate Protection Provided to Madison and Corebridge is Appropriate and Should be Approved.

44.     The Debtors' use of property of their estates, including the Cash Collateral, is governed by section 363 of the Bankruptcy Code. It provides in relevant part:

> If the business of the debtor is authorized to be operated under section [1108] of this title and unless the court orders otherwise, the [debtor] may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C. § 363(c)(1). Pursuant to section 363(c)(2) of the Bankruptcy Code, a debtor may not use cash collateral unless "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2). Section 363(e) of the Bankruptcy Code provides for adequate protection of interests in property when a debtor uses cash collateral. Further, section 362(d)(1) of the Bankruptcy Code provides for adequate protection of interests in property due to

the imposition of the automatic stay. *See In re Cont'l Airlines*, 91 F.3d 553, 556 (3d Cir. 1996) (en banc).

45.     Generally, what constitutes adequate protection is decided on a case-by-case basis. While section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting administrative claims, courts decide what constitutes sufficient adequate protection in each case. *See In re Timbers of Inwood Forest Assocs., Ltd.*, 793 F.2d 1380, 1393 (5th Cir. 1986) (citing legislative history for proposition that the form of adequate protection is determined on a case-by-case basis); *In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) (explaining that the "determination of whether there is adequate protection is made on a case by case basis"); *In re Las Torres Dev., L.L.C.*, 413 B.R. 687, 696–97 (Bankr. S.D. Tex. 2009) (same). The concept of adequate protection is designed to shield a secured creditor from diminution in the value of its interest in collateral during the period of a debtor's use. *See Timbers of Inwood*, 793 F.2d at 1412; *see also In re Cont'l Airlines, Inc.*, 154 B.R. 176, 180– 81 (Bankr. D. Del. 1993) (holding that adequate protection for use of collateral under section 363 of the Bankruptcy Code is limited to use-based decline in value). Whether the debtor's estate will benefit on the whole from its use of cash collateral is relevant to determining the sufficiency of adequate protection. *See In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992); *see also In re Salem Plaza Assocs.*, 135 B.R. 753, 758 (Bankr. S.D.N.Y. 1992) (holding that debtor's use of cash collateral to pay operating expenses, thereby "preserv[ing] the base that generates the income stream," provided adequate protection to the secured creditor).

46.     As set forth in the proposed Interim Order, the Debtors propose to provide Madison and Corebridge with a variety of adequate protection to protect against the postpetition diminution in value of their purported prepetition collateral, including Cash Collateral, resulting

from the use, sale, or lease of their purported prepetition collateral by the Debtors and the imposition of the automatic stay. Pursuant and subject to the conditions in the Interim Order, the adequate protection packages for Madison and Corebridge include, subject to the Final Order and subordinate and subject to Carve Out, the Madison Lien, the Corebridge Lien, Valid Mechanics' Liens, and the DIP Liens: (i) superpriority administrative expense claims to the extent provided by section 507(b) of the Bankruptcy Code in favor of Madison and Corebridge in the amount of their respective diminution in value; (ii) periodic interest payments to Corebridge; and (iii) continued maintenance and insurance of the Alameda Properties, Ritz-Related Properties, 11751 Alameda Property, Joe Battle Property, and DIP Collateral (collectively, the "**Adequate Protection**").

47.     The Debtors submit that the improved position of Madison and Corebridge's collateral positions, in addition to the protections the Debtors have offered, is more than sufficient to adequately protect such parties from any diminution in the value of their purported prepetition collateral.

## III.     The Scope of the Carve Out Is Appropriate.

48.     All liens and claims granted by Interim or Final Orders as security for the DIP Obligations, including, without limitation, the DIP Liens and the proposed Adequate Protection, are subject to the Carve Out.[9] Without the Carve Out, the Debtors and other parties in interest may be deprived of certain rights and powers because the services for which professionals may be paid in these Chapter 11 Cases would be restricted. *See In re Ames Dep't Stores*, 115 B.R. at 40 (observing that courts insist on carve outs for professionals representing parties in interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest

---

[9] Such lien and claims are not subordinate Madison Lien and the Corebridge Lien, subject to the Final Order.

are sorely prejudiced."). The Carve Out does not directly or indirectly deprive the Debtors' estates or other parties in interest of possible rights and powers. Additionally, the Carve Out protects against administrative insolvency during the course of these Chapter 11 Cases by ensuring that assets remain for the payment of the Clerk of this Court, U.S. Trustee fees, and professional fees of the Debtors and any statutory committee appointed under section 1102 of the Bankruptcy Code in these Chapter 11 Cases.

### IV.   Waiver of Section 506(c) of the Bankruptcy Code with Respect to DIP Collateral is Appropriate.

49.   Section 506(c) of the Bankruptcy Code authorizes a debtor to "recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim." 11 U.S.C. § 506(c). The underlying premise of this exception is that unsecured creditors should not be required to bear the costs of preserving a secured creditor's collateral. *See In re Evanston Beauty Supply Inc.*, 136 B.R. 171, 175 (Bankr. N.D. Ill. 1992). However, debtors can, and often do, waive the right to surcharge collateral. In exchange for the proposed DIP Facility, as set forth herein, and after negotiations with the DIP Lenders, the Debtors have agreed to waive, without prejudice to any provisions of the Final Order, certain rights to surcharge the DIP Collateral and prepetition collateral pursuant to section 506(c) of the Bankruptcy Code with respect to the DIP Facility. This was an important concession given the immediate need for liquidity and the lack of other viable financing options or access to Cash Collateral.

### V.   The Debtors Should Be Authorized to Pay the Interest and Fees Required by the DIP Lenders under the DIP Documents.

50.   In connection with negotiating the DIP Documents, the Debtors have agreed, subject to Court approval, to pay certain fees and premiums to the DIP Lenders. In

particular, as noted above, the Debtors have agreed to pay the interest and fees consisting of the following:

- **Issuance Fee**: The DIP Borrowers will pay DIP Lender an issuance fee of 1.50% of the amount of the Initial Draw and each Additional Draw, which fee will be earned and payable on the date of each draw (the issuance fee will be capitalized and added to the funded amount but not counted against draw limits).

- **Cash Interest**: None.

- **PIK Interest**: The DIP Borrowers will pay the DIP Lender PIK interest at 15.0% per annum on the outstanding funded amount, which shall be added to the funded amount on a monthly basis but not counted against draw limits for any of the draws contemplated.

- **Exit Fee**: The DIP Borrowers will pay the DIP Lender an exit fee of 2.0% multiplied by the funded amount. Such exit fees will be payable on the earlier to occur of any prepayment date and Repayment Date. If DIP Lender chooses to roll the DIP Loan into a proposed exit financing, such exit fee will be waived.

- **Default Interest Rate**: During the occurrence and continuance of an event of default, the PIK interest rate will increase by 3.0%.

- **Renewal Fees**:  If the DIP Loan is not repaid in full on or before the Repayment Date, time being of the essence, the DIP Borrowers will pay to the DIP Lender, in addition to all other fees and other amounts as set forth in the DIP Term Sheet, a renewal fee of 2.0% of the total principal amount as of the Repayment Date, which shall extend the Repayment Date by an additional 3 months (the renewal fee will be capitalized and added to the funded amount at the time of extension, but, if applicable, will not count against draw limits). The DIP Borrowers shall be entitled to no more than one (1) three-month extension period at the Repayment Date (based on mutually agreed operating and restructuring milestones).

- **Unused Fee**: Effective upon the entry of the Final Order, the DIP Borrowers thereafter will pay the DIP Lender an unused fee at 2.0% per annum on the undrawn outstanding total principal amount, which shall be added to the funded amount on a monthly basis and will not count against draw limits for any of the draws contemplated herein.

- **Minimum Multiple of Invested Capital:** The DIP Borrowers will pay the DIP Lenders a cash fee at exit such that the DIP Lender's multiple of invested capital for each advance (the initial advance and each additional advance individually), exclusive of any fees, shall be no less than 1.15x.

*See* DIP Term Sheet at 3–4.

51.     There is ample justification for this Court to approve the payment of such interest and fees, which are part of the DIP Term Sheet. As set forth in the DIP Declaration, the Debtors believe that the interest and fees to be paid under the DIP Facility and the Interim Order are consistent with the market and are reasonable and appropriate, particularly in light of the circumstances of these Chapter 11 Cases and the marketing process undertaken, and represent the only viable option presently available to the Debtors. DIP Decl. ¶ 18. The fees and rates to be paid under the proposed DIP Facility and the Interim Order (i) were the subject of arm's-length negotiation between the Debtors and the DIP Lenders and (ii) are an integral component of the overall terms of the proposed DIP Facility and the Interim Order. DIP Decl. ¶¶ 15, 18. The Debtors considered the fees described above when determining in their sound business judgment that the DIP Facility is reasonable and constitutes the best terms on which the Debtors can obtain the postpetition financing to allow them to continue their operations, prosecute their cases, and benefit the Debtors' estates. DIP Decl. ¶ 18. Moreover, the Debtors negotiated reasonable fees despite the limited market interest in providing the Debtors with a sufficiently sized and appropriately-structured postpetition financing package. DIP Decl. ¶ 15. Accordingly, the Court should authorize the Debtors to pay the interest and fees provided under the DIP Documents in connection with the DIP Facility.

## VI.     The DIP Secured Parties Should be Afforded Good-Faith Protection under Section 364(e) of the Bankruptcy Code.

52.     Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this

section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

53.     As set forth above, the DIP Facility is the result of (i) the Debtors' reasonable and informed determination that the DIP Lender offered the most favorable terms on which to obtain vital postpetition financing, and (ii) extensive arm's-length, good-faith negotiations with the DIP Lender. DIP Decl. ¶ 18. The terms and conditions of the DIP Facility are reasonable and appropriate under the circumstances, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code. DIP Decl. ¶¶ 18, 19. Further, the Debtors ran a competitive proposal process under the circumstances before selecting the DIP Lender's proposal as the winning bidder. DIP Decl. ¶¶ 13–16. Accordingly, the Court should find that the obligations arising under the DIP Facility and other financial accommodations made to the Debtors have been extended by the DIP Lender in "good faith" within the meaning of section 364(e) of the Bankruptcy Code and therefore the DIP Lender is entitled to all of the protections afforded thereby.

## VII.     The Automatic Stay Should Be Modified on a Limited Basis.

54.     The Interim Order provides that the automatic stay provisions of Section 362 of the Bankruptcy Code will be modified to allow the DIP Lender to file any financing statements, security agreements, notices of liens, and other similar instruments and documents in order to validate and perfect the liens and security interests granted to them under the Interim and Final Orders and authorize the Debtors to make, and the recipients to retain and apply, payments. The proposed Interim Order further provides that the automatic stay is modified to the extent necessary to implement and effectuate the terms of the Interim Order.

55.     Stay modifications of this kind are ordinary and standard features of debtor-in-possession financing arrangements, and, in the Debtors' business judgment, are reasonable and fair under the circumstances of these Chapter 11 Cases. *See* DIP Decl. ¶¶ 19, 22.

56.     Moreover, if there is a DIP termination event and following the delivery of the DIP termination notice, but before exercising the remedies set forth in the DIP Term Sheet or any other remedies, Debtors request that the DIP Lender be required to file a motion with the Court seeking emergency relief on not less than five (5) business days' notice to the Debtors (with a copy of such notice provided to counsel for the Debtors, counsel for any Creditors' Committee, and the U.S. Trustee) for a further order of the Court modifying the automatic stay in the Chapter 11 Cases to permit the DIP Lender to, subject to the Carve Out, Madison Lien, Corebridge Lien, and Valid Mechanics' Liens, exercise its remedies under the DIP Term Sheet.

**VIII.    Failure to Obtain Immediate Interim Access to the DIP Facility Will Cause Immediate and Irreparable Harm.**

57.     Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code or to use cash collateral pursuant to section 363 of the Bankruptcy Code may not be commenced earlier than fourteen days after the service of such motion. Upon request, however, the Court may conduct a preliminary expedited hearing on the motion and authorize the obtaining of credit and use of cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate. *See* Bankruptcy Rule 4001(b)(2). Section 363(c)(3) of the Bankruptcy Code authorizes the Court to conduct a preliminary hearing and to authorize the use of cash collateral "if there is a reasonable likelihood that the [debtor] will prevail at the final hearing under [section 363(e) of the Bankruptcy Code]." 11 U.S.C. § 363(c)(3). Furthermore, the Complex Case Procedures provide that "on motion by the

debtors, a hearing . . . will routinely be conducted as a first-day hearing to consider either cash collateral use and/or interim debtor-in-possession financing . . . ." Complex Case Procedures ¶ 5.

58.     The Debtors are seeking authority solely to obtain and use funds necessary to administer these Chapter 11 Cases during the interim period. The relief requested herein is limited to interim DIP financing and the use of Cash Collateral to fund the immediate costs and expenses associated with the commencement and administration of these cases, including the payment of professional fees and other essential expenditures during the interim period. The Debtors are not, by this Motion, seeking approval of any post-interim period funding or any terms relating to the use of funds beyond the interim period. The Debtors intend to file a supplemental briefing to provide the Court and parties in interest with a description of the funds required for the post-interim period and the basis for such relief.

59.     Importantly, the relief sought on an interim basis does not include the priming of any existing secured creditors; rather, the liens to be granted to the DIP Lenders during the interim period will be junior and subordinate to both the Carve Out and all valid, perfected, and non-avoidable prepetition liens. DIP Decl. ¶ 16. This approach ensures that the interests of existing secured creditors are preserved during the interim period, while providing the Debtors with the liquidity necessary to avoid immediate and irreparable harm to their estates.

60.     Accordingly, pursuant to section 363(c)(3) of the Bankruptcy Code and Bankruptcy Rules 4001(b) and 4001(c), the Debtors request that the Court hold and conduct a hearing to consider entry of the Interim Order authorizing the Debtors, from and after entry of the Interim Order, to receive initial funding under the DIP Facility and to use Cash Collateral. This relief will enable the Debtors to preserve and maximize value and, therefore, avoid immediate and irreparable harm and prejudice to their estates and all parties in interest, pending a final order.

## EMERGENCY CONSIDERATION

61.     Pursuant to Bankruptcy Local Rule 9013-1, the Debtors request emergency consideration of this Motion pursuant to Bankruptcy Rule 6003, which empowers a court to grant relief within the first twenty-one days following the commencement of a chapter 11 case if "relief is needed to avoid immediate and irreparable harm." For the reasons discussed above, an immediate and orderly transition into chapter 11 is critical to the viability of the Debtors' operations. Failure to receive the requested relief in this Motion during the first twenty-one days of these Chapter 11 Cases would severely disrupt the Debtors' operations at this important juncture and cause immediate and irreparable harm. DIP Decl. ¶¶ 8, 12. The requested relief is necessary for the Debtors to operate their business in the ordinary course, preserve the ongoing value of their operations, and maximize the value of their estates for the benefit of all stakeholders. DIP Decl. ¶¶ 8, 10. The Debtors have demonstrated that the requested relief is "needed to avoid immediate and irreparable harm," as contemplated by Bankruptcy Rule 6003, and request that the court grant the relief requested in this Motion. If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity, priority, or amount of any particular claim or a waiver of the Debtors' or any other party in interest's rights to subsequently dispute such claim.

## WAIVER OF BANKRUPTCY RULES 6004(a) AND 6004(h)

62.     The Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the fourteen-day stay period under Bankruptcy Rule 6004(h).

## RESERVATION OF RIGHTS

63.     Notwithstanding anything to the contrary herein, nothing contained in this Motion or any actions taken pursuant to any order granting the relief requested by this Motion, and

no action taken by the Debtors pursuant to the relief requested or granted (including any payment made in accordance with any such order), is intended as or shall be construed or deemed to be: (a) an implication or admission as to the amount of, basis for, priority, or validity of any claim against a Debtor entity under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's rights to dispute any claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion or any order granting the relief requested by this Motion or a finding that any particular claim is an administrative expense claim or other priority claim; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (g) a waiver or limitation of any claims, causes of action, or other rights of the Debtors or any other party in interest against any person or entity under the Bankruptcy Code or any other applicable law; (h) an approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy under section 365 of the Bankruptcy Code; (i) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief requested in this Motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens; (j) a waiver of the obligation of any party in interest to file a proof of claim; or (k) otherwise affecting the Debtors' rights under section 365 of the Bankruptcy Code to assume or reject any executory contract or unexpired lease.

## NOTICE

64.     The Debtors will provide notice of this Motion to the following parties or their respective counsel: (a) the Office of the United States Trustee for the Southern District of

Texas; (b) the holders of the thirty largest unsecured claims against the Debtors (on a consolidated basis); (c) the United States Attorney's Office for the Southern District of Texas; (d) the Internal Revenue Service; (e) the United States Securities and Exchange Commission; (f) the state attorneys general for states in which the Debtors conduct business; (g) the DIP Lenders; (h) the agents for certain prepetition and postpetition lenders of the Debtors; and (i) any party that has requested notice pursuant to Bankruptcy Rule 2002. In light of the nature of the relief requested, no other or further notice need be given.

[*Remainder of page intentionally left blank*].

## **CONCLUSION**

WHEREFORE, the Debtors request that the Court enter the Interim Order granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Dated:     November 5, 2025
            Dallas, Texas

*/s/ Nicholas J. Hendrix*
**O'MELVENY & MYERS LLP**
Nicholas J. Hendrix (TX Bar No. 24087708)
2801 North Harwood Street, Suite 1600
Dallas, Texas 75201
Telephone: (972) 360-1900
Facsimile: (972) 360-1901
Email: nhendrix@omm.com

- and -

Julian Gurule (*pro hac vice* admission pending)
400 South Hope Street, 19th Floor
Los Angeles, California 90071
Telephone: (213) 430-6000
Facsimile: (213) 430-6407
Email: jgurule@omm.com

- and -

Peter Friedman (*pro hac vice* admission pending)
Matthew Kremer (*pro hac vice* admission pending)
Diana M. Perez (*pro hac vice* admission pending)
1301 Avenue of the Americas, Suite 1700
New York, New York 10019
Telephone: (212) 326-2000
Facsimile: (212) 326-2061
Email: pfriedman@omm.com
       mkremer@omm.com
       dperez@omm.com


*Proposed Attorneys for the*
*Debtors and Debtors in Possession*

## Certificate of Accuracy

In accordance with Bankruptcy Local Rule 9013-1(i), I hereby certify that the foregoing statements are true and accurate to the best of my knowledge.

*/s/ Nicholas J. Hendrix*
Nicholas J. Hendrix

## Certificate of Service

I certify that on November 5, 2025, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas and will be served as set forth in the Affidavit of Service to be filed by the Debtors' noticing agent.

*/s/ Nicholas J. Hendrix*
Nicholas J. Hendrix
