IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

---

| | |
|---|---|
| In re:<br><br>F-STAR SOCORRO, L.P., *et al.*,<br>         Debtors.[1] | Chapter 11<br><br>Case No. 25-90607 (ARP)<br><br>Jointly Administered<br><br>**Re: Docket No. 17** |

---

## DECLARATION OF LANCE MILLER IN SUPPORT OF DEBTORS' EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS TO (A) OBTAIN POSTPETITION SECURED FINANCING AND (B) USE CASH COLLATERAL; (II) GRANTING LIENS AND PROVIDING CLAIMS WITH SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (III) GRANTING ADEQUATE PROTECTION TO THE PREPETITION SECURED PARTIES; AND (IV) <u>GRANTING RELATED RELIEF</u>

I, Lance Miller, declare as follows under penalty of perjury.

1.      I am the Managing Partner of Pivot Management Group, LLC ("**Pivot**") and the Chief Restructuring Officer (the "**CRO**") of F-Star Socorro, L.P. and Five Star Development Properties, LLC, as debtors and debtors in possession in the above-captioned chapter 11 cases and managing members of certain other subsidiaries and affiliates (collectively, the "**Debtors**"). Pivot is a financial advisory firm located at 1230 Rosecrans Ave., Suite 300-PMB928, Manhattan Beach,

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are F-Star Socorro, L.P. (7438); JNY, L.P. (3609); JNY II, L.P. (3041); 5 Star Tech I, L.P. (4020); 5 Star Tech II-1, LP (5916); 5 Star Tech II-4, LP (2357); 5-Star Tech II-2, L.P. (6602); F-Star Socorro Holding Co., LLC (6729); JNY Mezz, LLC (N/A); JNY Building Owner, LLC (6282); JNY II Mezz, LLC (N/A); JNY II Building Owner, LLC (9687); 5 Star Tech I GP, LLC (N/A); 5 Star Tech II-1 GP, LLC (N/A); 5 Star Tech II-4 GP, LLC (N/A); 1340 Bob Hope Drive Parent, LLC (N/A); 1340 Bob Hope Drive Owner, LLC (4986); 11751 Alameda Avenue Parent, LLC (N/A); 11751 Alameda Avenue Owner, LLC (2300); Unit 82 El Paso Owner, LLC (2399); Southwest Rojas Parent, LLC (N/A); Southwest Rojas, LLC (N/A); FSPV Mezz C Sub LLC (5233); FSPV Res C, LLC (8745); Five Star Development Properties, LLC (2183); Five Star Development Resort Communities, LLC (1282); Five Star Resort Holdings Parent, LLC (N/A); Five Star Resort Holdings, LLC (N/A); Five Star Resort Mezz, LLC (N/A); Five Star Resort Owner, LLC (4994); Five Star Land Holdings Parent, LLC (N/A); Five Star Land Holdings (AZ), LLC (N/A); Five Star Land Mezz, LLC (N/A); and Five Star Land Owner, LLC (2183). The Debtors' mailing address in these chapter 11 cases is 6720 N. Scottsdale Rd., #130, Scottsdale, AZ 85253.

1

California 90266. Pivot provides a broad range of corporate advisory services to its clients including, without limitation, restructuring, strategic and transaction advisory, and strategic communications services. Pivot and its professionals have extensive experience in the reorganization and restructuring of distressed companies, both out of court and in chapter 11 proceedings, as well as in connection with the solicitation and consummation of debtor in possession financings. I am the Chief Restructuring Officer of the Debtors in these chapter 11 cases.

2. Additional information regarding my background is set forth in the *Declaration of Lance Miller in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings* (the "**First Day Declaration**"), which is incorporated by reference as though fully set forth herein.

3. I submit this declaration (this "**Declaration**") in support of the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors (a) to Obtain Postpetition Secured Financing and (b) Use Cash Collateral; (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status; (III) Granting Adequate Protection to the Prepetition Secured Parties; and (V) Granting Related Relief* (the "**Motion**").[2]

4. Except as otherwise indicated, the facts set forth in this Declaration are based on my personal knowledge of the Debtors' business, employees, operations, and financial condition that I have obtained since Pivot was retained, my review of relevant documents, and my opinion based upon experience, knowledge, and information concerning the Debtors' operations and financial condition, my own reasonable inquiry, and my discussions with members of the Debtors' senior management and employees, and the Debtors' professionals, as well as the information provided to me by Pivot professionals involved in advising the Debtors in these chapter 11 cases.

---

[2] Capitalized terms not otherwise in this Declaration have the same meanings as used in my First Day Declaration or the Motion, as applicable.

If called upon to testify, I could and would testify competently to the facts set forth in this Declaration and the Motion. I am over the age of 18 years and am authorized to submit this Declaration on the Debtors' behalf.

5. A multi-member team from Pivot has been working with the Debtors since early October, and I was officially appointed as CRO on November 3, 2025. Since being engaged, Pivot has rendered financial advisory services to the Debtors in connection with the Debtors' evaluation of their strategic alternatives. Additionally, Pivot has worked with the Debtors' management and other professionals retained by the Debtors, and has become familiar with the Debtors' capital structure, financial condition, and business. Information regarding the Debtors, their business, and the facts and circumstances supporting the Debtors' chapter 11 cases is set forth in the First Day Declaration.

I. **Background**

6. Pursuant to the DIP Motion, the Debtors seek approval of a secured superpriority multi-draw term loan facility that will provide immediate access to $6 million upon entry of the Interim Order, with the remaining $24 million becoming available upon the entry of the Final Order. The Debtors seek an Interim Order granting the DIP Lenders perfected junior security interest in the properties described in the DIP Term Sheet, and a Final Order granting a priority senior priming security interest in and liens upon properties described in the DIP Term Sheet. This Declaration addresses the Interim Order and will be supplemented in advance of a hearing on the Final Order (and the Debtors will provide supporting evidence in support of priming in advance of such hearing).

7. The Debtors are a commercial real estate company that develops and invests in residential, hospitality, retail, office, and industrial real estate. As discussed in the First Day Declaration, the Debtors anchor project includes a 122-acre ultra-luxury mixed-use development

3

located at the border of Paradise Valley and Scottsdale, Arizona (the "**Project**"). The Debtors also own and operate multiple commercial and industrial properties in El Paso, Texas (the "**Commercial Properties**"). These properties generally are financed by secured lenders in varying amounts, though significant equity value demonstrably exists in these properties. The Debtors propose to utilize this equity as collateral security for the DIP Facility in the form of second priority liens.

### II.    Debtors' Liquidity Needs

8.  As of the Petition Date, the Debtors' currently available cash on hand is approximately $287,000 which is insufficient to fund the administration of these chapter 11 cases while paying operating expenses related to both the Project and Commercial Properties in the ordinary course as they come due before a final hearing can be held. Accordingly, the Debtors have an immediate and critical need to obtain interim financing pursuant to the DIP Term Sheet.

9.  The Debtors worked with their professionals, including Pivot, to project the amount of postpetition financing necessary to administer the chapter 11 cases while operating the Debtors' business, and developed the Initial DIP Budget attached to the proposed Interim Order as **Exhibit B**.

10. The Debtors and their advisors determined that the Debtors would require liquidity of up to $30 million—including up to $6 million during the interim period—to operate in the ordinary course of business postpetition and satisfy all administrative costs and expenses while giving the Debtors the opportunity to assess strategic alternatives to maximize the value of the Debtors' business and address the Debtors' outstanding liabilities.

11. The Initial DIP Budget contains line items for each category of revenue anticipated to be received and all reasonable, necessary, and foreseeable expenses to be incurred in connection with the operation of their business for the period set forth therein. The Initial DIP Budget

establishes that the Debtors will have adequate liquidity to operate their business and administer their chapter 11 cases if the DIP Facility is authorized.

12. The Debtors and their estates will face immediate and irreparable harm if interim approval of the DIP Facility is not obtained. Absent funds available from the DIP Facility and the cooperation of key business partners at this critical early stage of the chapter 11 cases, the Debtors could face a value-destructive interruption to their business to the detriment of the Debtors, their estates, and their creditors.

### III. DIP Facility Marketing Process

13. The DIP Facility is the result of a marketing process conducted by Pivot, which was designed to secure postpetition financing on the best available terms. The Debtors, with the assistance of professionals at Pivot, began this marketing process by developing a list of sophisticated and knowledgeable institutions with an understanding of the Debtors' business. In creating this list, the Debtors also considered which institutions would be most capable of providing postpetition financing quickly and on terms most favorable to the Debtors. Pivot launched a formal outreach to potential DIP lenders on or around October 20, 2025, and contacted over twenty parties. Thirteen parties executed non-disclosure agreements for access to a virtual data room containing diligence materials related to the requested financing.

14. As a result of this outreach, Pivot received three term sheets from potential DIP lenders. After consulting with the Debtors and me, Pivot engaged in several rounds of discussions with each of the potential DIP lenders and successfully negotiated improvements to the proposals, including the proposal from Sandton Capital Solutions Master Fund VI, LP (the "**DIP Lender**").

15. After reviewing and considering the indications of interest, the Debtors, in their business judgment and in consultation with me and their legal professionals and other advisors, determined that the DIP Lender's proposal represented the best available terms for DIP financing.

Negotiations around the terms of the proposed DIP Facility, including the interest rates, fees, and other legal protections, extended for several days.

16. With the assistance of Pivot, the Debtors solicited other sources of postpetition financing to determine whether the Debtors could obtain financing on better terms. However, none of these other potential sources of postpetition financing offered to make available financing that the Debtors deemed to be better than the DIP Facility. In particular, no party contacted as part of the financing search process was interested in providing postpetition financing to the Debtors solely on an unsecured or administrative priority basis. The proposed interim DIP Facility grants junior liens on several properties more fully outlined in the DIP Term Sheet. Upon entry of the Final Order, the DIP Lender would receive a priority senior priming security interest in and liens on The Palmeraie Scottsdale, The Palmeraie Paradise Valley, the Ritz-Carlton Resort, the Ritz-Carlton Villas, and the Ritz-Carlton Estate Lots. Notably, the vast majority of financial institutions contacted during the solicitation process were unable or unwilling to extend credit on a junior basis during the interim period.

### IV. DIP Facility's Principal Terms are Competitive and the Best Option

17. As set forth more fully in the Motion, the DIP Facility will provide up to $30 million in financing. The DIP Facility has a twelve-month maturity with an option for the Debtors, subject to certain conditions, to extend that maturity by three months. The DIP Lender has also agreed to consider converting some or all of the DIP Facility to an exit financing facility in conjunction with an emergence from chapter 11 (subject to terms agreeable to DIP Lender and DIP Lender's internal approvals). This proposed DIP Facility is expected to provide the Debtors with access to the amount of capital that the Debtors believe is necessary to administer these chapter 11 cases.

18. The terms of the DIP Facility are the product of good faith, extensive, arm's-length negotiations between the Debtors, together with their professionals and advisors, and the DIP

6

Lender. The Debtors believe, after consultation with counsel and other professionals and advisors, that the DIP Facility, taken as a whole, is fair and reasonable and provides the most favorable terms available for postpetition financing under the circumstances of these chapter 11 cases.

19. I also believe, based on my experience with debtor-in-possession financing transactions as well as my knowledge of the Debtors' businesses and financial affairs, that the economic terms and conditions of the DIP Facility are competitive, and, taken as a whole, represent the best financing presently available to Debtors under the circumstances of these chapter 11 cases. The fees and expenses are, in the aggregate, generally consistent with debtor-in-possession financings of this type and size in matters with which I have been involved.

20. Further, the covenants and other noneconomic terms are reasonable under the circumstances of these chapter 11 cases. These terms were required by the DIP Lender, who viewed them as integral components of the overall terms of the DIP Facility, as consideration for the extension of post-petition financing.

21. The Debtors believe, in their business judgment, that the terms of the DIP Facility are fair, equitable, and in the best interest of the Debtors' estates, their creditors, and all parties in interest. Absent approval of the DIP Facility, the Debtors will be unable to fund the administration of the chapter 11 cases while continuing to operate their business in the ordinary course and preserving and maximizing the value of their assets for the benefit of all parties in interest.

22. In sum, for the reasons stated above, and based on my experience with debtor-in-possession financing transactions as well as my participation and involvement in the outreach for postpetition financing for the Debtors, I believe that the proposed DIP Facility, taken as a whole, offers the best presently available financing option for the Debtors under the facts and circumstances of these chapter 11 cases. Additionally, I believe that the principal economic terms

proposed under the DIP Facility (such as the fees, interest rate, and default rate), are customary and usual for DIP financings of this type, were negotiated in good faith and at arm's length, and are, in the aggregate, generally consistent with terms of DIP financings in comparable circumstances.

I declare under penalty of perjury of the laws of the United States that these facts are true to the best of my knowledge and belief.

Dated: November 5, 2025
　　　　Los Angeles, California

　　　　　　　　　　　　　　　　　　　　　　　　*/s/ Lance Miller*
　　　　　　　　　　　　　　　　　　　　　　　　Lance Miller
　　　　　　　　　　　　　　　　　　　　　　　　Chief Restructuring Officer