### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

--------------------------------------------------------- x

In re:

F-STAR SOCORRO, L.P., *et al.*,

Debtors. [1]

:
:
:
:
:
:
:
:
:

Chapter 11

Case No. 25-90607 (ARP)

Jointly Administered

--------------------------------------------------------- x

### DECLARATION OF LANCE MILLER IN SUPPORT OF THE
### DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS

I, Lance Miller, declare under penalty of perjury:

1.  I am the Managing Partner of Pivot Management Group, LLC ("**Pivot**") and the Chief Restructuring Officer of F-Star Socorro, L.P. and Five Star Development Properties, LLC, as debtors and debtors in possession in the above-captioned chapter 11 cases and managing members of certain other subsidiaries and affiliates (collectively, the "**Debtors**," and together with the Debtors' non-debtor affiliates, "**Five Star**" or the "**Company**").

2.  Pivot is a financial advisory firm located at 1230 Rosecrans Ave., Suite 300-PMB928, Manhattan Beach, California, 90266. Pivot provides a broad range of corporate advisory

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are F-Star Socorro, L.P. (7438); JNY, L.P. (3609); JNY II, L.P. (3041); 5 Star Tech I, L.P. (4020); 5 Star Tech II-1, LP (5916); 5 Star Tech II-4, LP (2357); 5-Star Tech II-2, L.P. (6602); F-Star Socorro Holding Co., LLC (6729); JNY Mezz, LLC (N/A); JNY Building Owner, LLC (6282); JNY II Mezz, LLC (N/A); JNY II Building Owner, LLC (9687); 5 Star Tech I GP, LLC (N/A); 5 Star Tech II-1 GP, LLC (N/A); 5 Star Tech II-4 GP, LLC (N/A); 1340 Bob Hope Drive Parent, LLC (N/A); 1340 Bob Hope Drive Owner, LLC (4986); 11751 Alameda Avenue Parent, LLC (N/A); 11751 Alameda Avenue Owner, LLC (2300); Unit 82 El Paso Owner, LLC (2399); Southwest Rojas Parent, LLC (N/A); Southwest Rojas, LLC (N/A); FSPV Mezz C Sub LLC (5233); FSPV Res C, LLC (8745); Five Star Development Properties, LLC (2183); Five Star Development Resort Communities, LLC (1282); Five Star Resort Holdings Parent, LLC (N/A); Five Star Resort Holdings, LLC (N/A); Five Star Resort Mezz, LLC (N/A); Five Star Resort Owner, LLC (4994); Five Star Land Holdings Parent, LLC (N/A); Five Star Land Holdings (AZ), LLC (N/A); Five Star Land Mezz, LLC (N/A); and Five Star Land Owner, LLC (2183). The Debtors' mailing address in these chapter 11 cases is 6720 N. Scottsdale Rd., #130, Scottsdale, AZ 85253.

services to its clients including, without limitation, restructuring, strategic and transaction advisory, and strategic communications services. As the Managing Partner of Pivot, I have extensive experience in the reorganization and restructuring of troubled companies, both out-of-court and in chapter 11 proceedings. My experience includes engagements in the following matters, among others: *Maricopa Orchards, LLC,* Case No. 27-01102 (E.D. Cal.); *In re iCap Enterprises, Inc.,* Case No. 23-01243 (Bankr. E.D. Wash.); *In re International Longshore and Warehouse Union*, Case No. 23-30662 (Bankr. N.D. Cal.); *In re PP Group, LLC*, Case No. 20-10910 (Bankr. D. Del.); *In re Easterday Ranches, Inc.*, Case No. 21-00141 (Bankr. E.D. Wash.); *In re MD America Energy, LLC*, Case No. 20-34966 (Bankr. S.D. Tex.); *In re Yogaworks, Inc.*, Case No. 20-12599 (Bankr. D. Del.); *In re Chesapeake Energy Corp.*, Case No. 20-32333 (Bankr. S.D. Tex.); *In re Lear Capital, Inc.*, Case No. 22-10165 (Bankr. D. Del.); *In re CalPlant I Holdco, LLC*, Case No. 21-11302 (Bankr. D. Del.); *Apex Parks Group*, Case No. 22-10165 (Bankr. D. Del.); *Chemtura Corp.*, Case No. 09-11233 (Bankr. S.D.N.Y.).

3.     Prior to joining Pivot, I was a partner at Paladin Management Group, a national turnaround consulting firm that provides turnaround, business and advisory, and restructuring services over multiple industries and markets. Prior to joining Paladin, I was the general counsel and chief restructuring officer at Sugarfina, Inc., and general counsel at American Apparel, Inc. I earned a B.A. degree from the University of California, San Diego, and a J.D. degree from Boston University School of Law. I have 20 years of experience as an advisor and fiduciary in corporate restructurings and distressed situations. I have advised companies, creditors, shareholders, and other stakeholders regarding restructurings and recapitalizations, chapter 11 reorganizations, and mergers and acquisitions.

4.      A multi-member team from Pivot has been working with the Debtors since early October, and I was officially appointed as CRO on November 3, 2025. As a result of Pivot's work with the Debtors, their affiliates, and the Debtors' other advisors, I have become generally familiar with the Company's day-to-day operations, financial matters, operations, and underlying books and records. Except as otherwise indicated, all facts set forth in this Declaration are based on my personal knowledge, my discussions with other members of the Debtors' management, employees, and advisors, my review of relevant documents, or my opinion based on my experience, knowledge, and information concerning the Debtors' operations and financial condition. If called to testify, I would testify competently to the facts set forth in this Declaration. I am authorized to submit this Declaration on behalf of the Debtors.

5.      On November 4, 2025 (the "**Petition Date**"), the Debtors commenced voluntary cases under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas. I submit this Declaration to describe the Debtors' background and the circumstances that led to the Debtors' chapter 11 filings. I also submit this Declaration in support of relief the Debtors have requested in the "first day" applications and motions filed with the Court (collectively, the "**First Day Pleadings**"). All of the relief sought in the First Day Pleadings is necessary to stabilize the Debtors' operations, minimize potential adverse effects of filing bankruptcy, and ease the administrative burden of operating in chapter 11.

6.      This Declaration is divided into five parts: **Part I** sets forth an executive summary. **Part II** describes the Debtors' businesses, organizational structure, and prepetition indebtedness. **Part III** describes the circumstances leading to the commencement of these chapter 11 cases. **Part IV** describes the Debtors' objectives for these cases. **Part V** summarizes the First

Day Pleadings and explains why the relief requested in those pleadings is appropriate and necessary.

## I.   <u>EXECUTIVE SUMMARY</u>

7.      The Debtors are a commercial real estate company that develops and invests in residential, hospitality, retail, office and industrial real estate. Within the Debtors' portfolio, are several commercial and industrial properties in El Paso, Texas (collectively, the "**Commercial Properties**") and a 122-acre ultra-luxury mixed-use development located at the border of Paradise Valley and Scottsdale, Arizona (the "**Project**"). The Project is anchored by a new-build Ritz-Carlton Resort—the first ground-up Ritz-Carlton resort constructed in over 15 years—surrounded by eighty custom-built Ritz-Carlton-branded villas and thirty high-end estate homes. Later phases, including The Palmeraie, will include additional luxury residential, retail, entertainment, dining, and other amenities. The Debtors also own and operate several commercial and industrial properties in El Paso, Texas.

8.      The Project is largely completed. 44 of the villas already sold and multiple others are ready to close over the next several months. Substantially all infrastructure on the Project is complete, and ready to enter the final phases of construction. Unfortunately, the Project has been substantially or entirely stalled since early 2025, when the Company's senior secured lender, Madison Realty Capital L.P., and its affiliated single-purpose vehicle, RC PV Lender 1 LLC (collectively, "**Madison**"), slowed and ultimately halted funding for the Project. The Debtors believe that Madison is engaged in a long-running "loan to own" scheme involving Madison's substantial and improper interference with development efforts in an effort to over-lever the Project and delay the Debtors' ability to close on sales or other refinancing transactions that could

repay Madison's loans. These are not simply unproven allegations. Indeed, as discussed more fully

herein, following a two-day evidentiary hearing, a Texas state court entered the following finding:

> [T]here has been no breach of or default under the Construction
> Loan Agreement by the Plaintiffs or any of the Borrowers pursuant
> to which foreclosure at this time would be proper; alternatively, *if
> there has been such a breach or default, then the breach or default
> was artificially instigated, induced, and caused by [Madison's] acts
> of manipulation and fraud in breach of their duty of good faith and
> fair dealing under the Construction Loan Agreement and in
> repudiation of Defendants' obligation under the said agreement and
> of the Borrowers' rights thereunder*.

Restraining Order and Order Setting Hearing for Temporary Injunction, *JNY Building Owner, LLC

et al. v. Madison Realty Capital, L.P. et al.*, Cause No. 2025DCV1925, at 1–2 (205th Jud. Dist.,

El Paso Cty., Tex., May 2, 2025) (emphasis added).

9.      Undeterred by the Texas court's findings, two days after the Texas court

entered its findings, Madison commenced a foreclosure sale to take possession and ownership of

the Project and other Arizona collateral. The "defaults" alleged by Madison in the Arizona

foreclosure effort were *the same defaults that the Texas court already found were contrived*.

10.     The Debtors commenced these Chapter 11 proceedings to, once and for all,

bring Madison's collection efforts and forum shopping to a conclusion. The Debtors intend to

complete the Project for the benefit of all stakeholders, including the local community and

employees. Without this proceeding, the Debtors could permanently lose this irreplaceable real

property and the years of investment, relationships, branding and goodwill. In addition, the Debtors

plan to use these proceedings to address certain issues related to the Commercial Properties,

including disputes with the lender of those properties regarding the Debtors' compliance with

certain insurance and tax obligations.

11.     Chapter 11 is the only proceeding that will preserve the value of the Debtors' business through the imposition of the automatic stay, while providing a forum to expeditiously pursue a plan of reorganization that will provide for the exit capital necessary to complete the Project. The Debtors also expect to file an adversary proceeding against Madison in the coming days which will seek to hold Madison accountable for its breaches, interference and bad faith conduct, and assert claims that only exist under the Bankruptcy Code to determine the proper amount of Madison's claim (as well as any liability Madison and others may have to the Debtors).

12.     Completion of this Project is critically important to not only the Debtors, but also multiple vendors, contractors, lienholders, employees, villa and estate owners, and Paradise Valley and Scottsdale—which have long supported the Debtors and the development of the Project. The Debtors look forward to moving expeditiously through these chapter 11 cases, culminating in confirmation of a plan of reorganization as early as possible in 2026.

## II.     OVERVIEW OF THE DEBTORS' BUSINESS OPERATIONS

13.     The Debtors own and operate a diversified portfolio of commercial real estate properties, including hotel, retail, office, and industrial properties. In 1978, Five Star, founded by Gerald C. Ayoub ("**Ayoub**"), established business in the El Paso/Ciudad Juarez border region.

14.     Organizational charts illustrating the Debtors' organizational structure, including for the Arizona and Texas properties, is attached as **Exhibit A**. Ayoub directly or indirectly owns the equity interests in each of the Debtors or controls and holds the power to vote 20% or more of the voting securities of each of the Debtors. Property-owning Debtors are wholly-

owned by upstream holding companies that are ultimately controlled by Ayoub directly or indirectly by non-Debtor entities controlled by Ayoub.

### A. The Project

15.     As noted above, the Debtors' flagship development is The Ritz-Carlton, Paradise Valley, Palmeraie—a 122-acre, master-planned luxury destination located at the border of Paradise Valley and Scottsdale, Arizona. When complete, it will be the first in the United States to integrate a new-build Ritz-Carlton resort hotel (the "**Hotel**"), a Ritz-Carlton-branded residential community of villas (the "**Villas**") and luxury estate homes (the "**Estate Homes**," and together with the Villas, the "**Residences**"), and a luxury retail, dining, and experiential district known as The Palmeraie ("**The Palmeraie**") within a single walkable environment.

### a)  Key Components of the Project

16.     The Project's design integrates three distinct yet complementary components, each intended to anchor it as a world-class destination.

- **The Ritz-Carlton, Paradise Valley Resort**. A newly constructed, 215-room ultra-luxury resort that will feature a 16,000-square-foot spa, more than 80,000 square feet of outdoor event space with panoramic mountain views, a signature 400-foot pool, and globally recognized restaurants, including Mott 32 and Carbone. Once operational, the Hotel will be operated by The Ritz-Carlton Hotel Company, LLC, a subsidiary of Marriott International, Inc. ("**Marriott**").

- **Ritz-Carlton–Branded Residences.** A resort-integrated enclave comprising 80 Villas (fully pre-sold) and 32 private Estate Homes, several of which are already occupied, under construction, or under contract. All homes feature direct access to the Hotel and retail district, with design standards synchronized to the Ritz-Carlton's global residential program. Additional residential phases have been approved for future release.

- **The Palmeraie**. A fully entitled 29-acre district planned to include approximately 160,000 square feet of world-class luxury retail, dining, and experiential offerings, designed as a walkable open-air extension of the Hotel. Multiple global luxury brands have executed leases or LOIs. Additional phases are approved for branded condominiums and office-integrated lifestyle assets.

17.     Renderings and current construction photographs reflect a project substantially complete and ready to deliver the benefits long anticipated by the Paradise Valley and Scottdale communities.



18.     The Hotel pool area will have a direct view of Camelback Mountain and will be the longest pool in North America. Below is the rendering of the final pool area and pictures of the current site:





19.     Hotel construction is in its final phase, with substantially all infrastructure complete, and luxury interior finishes ready to begin once court approvals are finalized. By way of illustration, below are renderings of the exterior of the Project and the current construction site:





20.     Many of the Villas and Estate Homes are complete and already occupied, as shown below:



*b)  Origin and History of the Project*

21.     The Debtors purchased the 122-acre site in May 2007 from an affiliate of Marriott for development as a mixed-use luxury destination, following a competitive bidding process that drew several national and international developers. My understanding is that Marriott selected the Debtors for their proven track record of conceiving and executing large-scale, high-value developments totaling millions of square feet and billions of dollars in investment across the Southwest. The Paradise Valley Town Council approved construction in early 2016, and the City of Scottsdale followed suit in 2017. During a single 2016 residential release, all 80 Ritz-Carlton Villas were pre-sold within days, generating approximately $250 million in purchase commitments and demonstrating extraordinary demand even before vertical construction began. Vertical construction of the hotel and residential components commenced in 2018 and continued through the Covid-19 pandemic.

22.     By 2023, the Hotel and Residences were nearing completion, supported by sustained market demand—including a robust waitlist of prospective buyers—global brand

strength, and substantial capital already deployed. Unfortunately, disputes with the Debtors' lender, Madison, interrupted progress and the Debtors' ability to satisfy their planned timeline for completing the Project.

### B. The Commercial Properties

23.     The Debtors also own and operate several commercial and industrial properties in El Paso, Texas, including (i) fully occupied warehouse and distribution facilities located at (x) 1273 Joe Battle Boulevard, El Paso, Texas; 1277 Joe Battle Boulevard, El Paso, Texas; 1281 Joe Battle Boulevard, El Paso, Texas; 1301 Joe Battle Boulevard, El Paso, Texas; and 1321 Joe Battle Boulevard, El Paso, Texas (together, the "**Joe Battle Property**") totaling over 775,000 square feet of net rentable area on over 40 acres of land; (y) 11751 Alameda Avenue, El Paso, Texas (the "**11751 Alameda Property**") totaling over 1,445,000 square feet of net rentable area on over 66 acres of land; and (z) 1340 Bob Hope Drive, El Paso, Texas (the "**1340 Bob Hope Property**") totaling over 190,000 square feet of net rentable area on over 9 acres of land; and (ii) vacant warehouse and distribution facilities at 11891 Alameda Avenue, El Paso, Texas (the "**11891 Alameda Property**") totaling over 860,000 square feet of net rentable land on over 34 acres. In addition, the Debtors own over 107 acres of vacant developable land in El Paso.

24.     These properties were developed by the Five Star team and Five Star continues to manage the portfolio using in-house personnel. Other than 11891 Alameda Property and the undeveloped land, the portfolio is fully leased to thirteen tenants under long term leases expiring anywhere from 2026 to 2036. Notably, average in place rents are approximately 30% below market, meaning there will be a significant amount of income and value creation as near term leases expire.

### C.  The Debtors' Prepetition Indebtedness

#### a)  The Madison Loan

25.     On or about May 11, 2023, certain of the Debtors entered into a Construction Loan Agreement with Madison (the "**CLA**"), providing for funding up to $585 million towards the Project. The CLA is secured by collateral located in both Texas and Arizona. The pledged collateral in Arizona consists of five parcels: the Palmeraie Scottsdale, the Palmeraie Paradise Valley, the Ritz-Carlton Resort, Ritz-Carlton Villas, and Ritz-Carlton Estate Homes or Lots. The Texas Collateral includes 1340 Bob Hope Property, 11891 Alameda Property, 11801 Alameda Ave., El Paso, TX, 12183 Alameda Ave., El Paso, TX, and land located at the 11751 Alameda Property. The CLA is personally guaranteed by Ayoub.

26.     On May 21, 2025, based on largely undisclosed calculations, Madison claimed that the Loan had been fully funded and no funds remain to complete construction.

27.     The Debtors have not completed an analysis of perfection under the CLA, and as noted below, substantial disputes exist with respect to the amount, allowance, appropriate treatment of, and potential setoff against the CLA.

#### b)  The Alameda Corebridge Loan

28.     On December 27, 2023, Debtor F-Star Socorro Holding Co., LLC ("**Socorro Holding**") entered into that certain Loan Agreement with AIG Asset Management (U.S.), LLC ("**AIG**"), wherein AIG furnished a $77 million loan (the "**Alameda Corebridge Loan**") to Socorro Holding, evidenced by various promissory notes dated December 27, 2023 between Socorro Holding and each of American General Life Insurance Company, National Union Fire Insurance Company of Pittsburgh, PA, and SV 2022-1 Commercial Mortgage Holdings Company, LLC. The obligations of Socorro Holding under the Alameda Corebridge Loan are

13

secured by the 11751 Alameda Property as evidenced by that certain Deed of Trust, Security

Agreement, Fixture Filing, Financing Statement and Assignment of Leases and Rents dated

December 27, 2023 for the 11751 Alameda Property. The Alameda Corebridge Loan is personally

guaranteed by Ayoub.

*c)   The Joe Battle Corebridge Loan*

29.    On December 27, 2023, Debtors 5 Star Tech I, L.P., 5 Star Tech II-1, LP,

and 5 Star Tech II-4, LP (together, the "**5 Star Borrowers**") entered into that certain Loan

Agreement with AIG wherein AIG furnished a $41.8 million loan (the "**Joe Battle Corebridge**

**Loan**") to the 5 Star Borrowers, evidenced by various promissory notes dated December 27, 2023

between the 5 Star Borrowers and each of American General Life Insurance Company, National

Union Fire Insurance Company of Pittsburgh, PA, and SV 2022-1 Commercial Mortgage Holdings

Company, LLC. The obligations of the 5 Star Borrowers under the Joe Battle Corebridge Loan are

secured by the Joe Battle Property as evidenced by that certain Deed of Trust, Security Agreement,

Fixture Filing, Financing Statement, and Assignment of Leases and Rents dated December 27,

2023 for the Joe Battle Property. The Joe Battle Corebridge Loan is personally guaranteed by

Ayoub.

## III.    EVENTS LEADING TO THE COMMENCEMENT OF THESE CHAPTER 11 CASES

### A.  The Company Alleges that Madison Embarked on a Loan to Own Strategy.

30.    The Debtors' relationship with Madison began to deteriorate almost

immediately after the CLA closed. The Debtors believe that Madison has embarked on a long-

running "loan to own" scheme, designed to capture all of the financial upside for Madison's owners

and investors and to the exclusion of the Debtors' other stakeholders. The Debtors' allegations

14

towards Madison are encompassed in the Arizona complaint (discussed below), a copy of which

is attached hereto as **Exhibit B.** Those allegations include the following:

- Madison allowed, encouraged, and directed the Debtors' general contractors to exceed controls in construction agreements (known as Guaranteed Maximum Price controls), as part of an effort to cause the Debtors to burn through loan proceeds and over-lever the Project and engineer defaults under the CLA.

- Madison directed that the Debtors' general contractors prioritize completion of the Residences and delay construction of the Hotel, in order to disrupt the Debtors' ability to complete their timeline for completing the entire Project and maximize Madison's near-term returns.

- Madison engineered alleged "defaults" under the CLA, in order to force the Debtors to provide successive acknowledgements and releases of liability and pave the way for a clear foreclosure effort.

- Once the foreclosure effort began, Madison engaged directly with local governmental officials in order to stop the issuance of certificates of occupancy for Villa and Estate Home sales and to continue starving the Debtors of resources to resist Madison's efforts.

**B. Madison Stops Funding, and the Texas Court Determines that Madison Committed Acts of Manipulation and Fraud in Breach of their Duty of Good Faith and Fair Dealing.**

31.     On or about April 9, 2025, Madison declared a default under the CLA,

stopped funding towards development of the Project (other than sales of Villas that resulted in

immediate closing proceeds to Madison), and scheduled a foreclosure of the Debtors' Texas

collateral. The Debtors commenced an action in the Texas Judicial Court for the City of El Paso

(the "**Texas Court**") to enjoin the foreclosure and determine whether a default properly existed

under the CLA. The Texas Court held a two-day evidentiary hearing on the Debtors' request for a

temporary restraining order, and received evidence (including testimony) from both parties.

Following that hearing, on May 2, 2025, the Texas court granted a temporary restraining order

barring the foreclosure, and ordered a hearing to determine whether a preliminary injunction

should be entered. *See JNY Building Owner, LLC et al. v. Madison Realty Capital, L.P. et al.*,

Cause No. 2025DCV1925 (205th Jud. Dist., El Paso Cty., Tex.). In so holding, the Texas Court

ruled that

> there exists a probable, imminent immediate danger of irreparable
> injury, loss, harm, and damage to the four [Five Star] Texas
> borrowers and . . . ***there has been no breach of or default*** under the
> Construction Loan Agreement by the Plaintiffs or any of the
> Borrowers pursuant to which foreclosure at this time would be
> proper; ***alternatively, if there has been such a breach or default,
> then the breach or default was artificially instigated, induced, and
> caused by Madison Realty Capital, L.P.'s and RC PV Lender I
> LLC's acts of manipulation and fraud in breach of their duty of
> good faith and fair dealing under the Construction Loan
> Agreement*** and in repudiation of Defendants' obligations under the
> said agreement and of the Borrowers' rights thereunder.

Temporary Restraining Order and Order Setting Hearing for Temporary Injunction, *JNY Building*

*Owner, LLC et al. v. Madison Realty Capital, L.P. et al.*, Cause No. 2025DCV1925, at 1–2 (205th

Jud. Dist., El Paso Cty., Tex., May 2, 2025) (emphasis added) (quotations omitted).

       32.    On June 9 and 10, 2025, the Texas Court held an evidentiary hearing to

determine whether to issue a temporary injunction pending trial.

       33.    After the evidentiary hearing, the Texas Court found the Debtor plaintiffs

had demonstrated a "probable right of recovery" on their claims and enjoined foreclosure pending

trial. The Texas Court found:

- The evidence presented "bona fide issues regarding whether Madison and RC PV
  repudiated the Loan obligations;"

- The evidence presented "bona fide issues regarding whether Madison and RC PV,
  acting together, first breached the Loan and/or repudiated the Construction Loan
  Agreement, thus excusing any subsequent breach(es) by Plaintiffs or any of
  Borrowers;"

- The evidence presented "bona fide issues regarding [Five Star's] claims that, from
  the outset, Madison and RC PV deceived and manipulated the Loan, the Plaintiffs,
  the Borrowers, and the contractors and subcontractors working on the Arizona
  development project in order to orchestrate and cause the defaults claimed by
  Madison and RC PV such that Madison and RC PV are estopped to rely on such
  defaults and/or the purported releases;"

- Defendants Madison and RC PV have failed to establish the amount presently due on the Loan and [Five Star] dispute[s] any Loan balance otherwise claimed by Madison and RC PV;"

- The evidence presented "bona fide issues regarding the accuracy and validity of the balance claimed by Madison and RC PV on the Loan and whether or not the sums claimed by Madison and RC PV are liquidated or unliquidated, including evidence that Madison and RC PV have failed to credit all of Borrowers' payments on the Loan; have failed to properly apply and account for Borrowers' payments on the Loan; have claimed accrued interest at rates in excess of the rates permitted under the Loan; have provided conflicting, and therefor questionable account statements to the Borrowers; have maintained inaccurate and incomplete records of the sums claimed by Madison and RC PV as loan advances or loan debits and credits in favor of the Borrowers, thus calling into question the accuracy of the sums claimed by Madison and RC PV as the balance due on the Loan; have refused to provide a full accounting of the sums and debits and credits included in the Loan balance; have failed to provide accountings sufficient for Borrowers to determine the validity of the various balances claimed by Madison and RC PV; and have not been transparent with the Borrowers (including Plaintiffs) regarding the loan balance or the credits and debits applied to arrive at the loan balance reported by Madison and RC PV…"

See Temporary Injunction *JNY Building Owner, LLC et al. v. Madison Realty Capital, L.P. et al.*, Cause No. 2025DCV19205, at 5–6 (205th Jud. Dist., El Paso Cty., Tex., July 1, 2025).

34.    Madison initially appealed the injunction order, but abandoned the appeal after the Debtors filed their answering brief. *See Madison Realty Cap., L.P. v. JNY Bldg. Owner, LLC*, No. 08-25-00179-CV, 2025 WL 2936898 (Tex. App.—El Paso Oct. 15, 2025, no pet.)

**C.  Madison Ignored the Texas Court's Ruling and Sought to Foreclose Against the Project.**

35.    On May 5, 2025, the Debtors filed a lender liability action in Arizona state court against Madison, seeking damages and injunctive relief for Madison's effort to subvert the Project. *Five Star Resort Owner, LLC, et al. v. RC PV Lender I LLC, et al.*, Case No. CV2025-015943 (Ariz. Superior Ct., Maricopa Cty.). That lawsuit is pending.

36.    Separately, on July 3, 2025, a mere two days after the Texas Court enjoined foreclosure in Texas, Madison executed a Notice of Trustee's Sale of the Arizona collateral (including the Project). However, Madison did not record or serve notice until August. After

17

learning of the threatened Trustee's Sale, the Debtors moved for entry of a preliminary injunction enjoining the sale of the Property. My understanding is that the facts and issues presented by Madison's effort to foreclose in Arizona are virtually identical to those on which Madison lost in the Texas action. The foreclosure sale is currently scheduled for November 12, 2025.

37.    Madison moved to dismiss the Debtors' complaint and opposed their application for a temporary restraining order. Not content with that opposition, however, on October 9, 2025, Madison also filed an application in the Arizona court for a receiver to seize control and finish the Project it has long stonewalled—turning its own obstruction into a bid for takeover.

### D.  Pending Disputes with Corebridge

38.    Corebridge has noticed certain events of default under the Alameda Corebridge Loan and the Joe Battle Corebridge Loan due to Socorro Holding and the 5 Star Borrowers purported failure to honor certain insurance and tax obligations under the agreements. The Debtors have engaged in constructive discussions with Corebridge regarding such alleged defaults and hope to resolve any outstanding disputes with Corebridge through these proceedings.

## IV.    OBJECTIVE OF THE BANKRUPTCY CASE

39.    The Debtors commenced these chapter 11 cases to protect and preserve the value of their businesses and assets, while obtaining the benefits of the automatic stay and the breathing spell afforded by the Bankruptcy Code in the face of escalating disputes with Madison—including the pending foreclosure and receivership actions.

40.    The Debtors believe that chapter 11 provides the most effective forum to: (i) consolidate the pending actions in Texas and Arizona, and stay Madison's ongoing enforcement actions that threaten to substantially erode going-concern value; (ii) centralize the resolution of the

parties' competing claims and defenses under the supervision of this Court; and (iii) facilitate a value-maximizing restructuring process for the benefit of all stakeholders. Although the Texas Court has already determined that the Debtors are not in default under the CLA and that Madison has acted unlawfully, the Debtors cannot risk an adverse ruling in the pending foreclosure and receivership actions, and potentially losing access to this one-of-a-kind Project that the Debtors have devoted the last decade to developing.

41. Accordingly, the Debtors intend to use these proceedings to achieve two parallel objectives: (i) engage an investment banker to solicit interest in an exit facility that will enable the Debtors to restart and complete the Project, which is essential to protect the many community stakeholders impacted by Madison's attempted foreclosure and upheaval of this multi-year Project, and (ii) to determine the proper amount of Madison's claim and pursue any counter-claims. With respect to the latter objective, the Debtors intend to file an adversary proceeding against Madison shortly. In addition, the Debtors intend to use these proceedings to address any other issues with respect to their broader portfolio, including working with Corebridge to address any purported defaults under the Alameda Corebridge Loan and the Joe Battle Corebridge Loan.

42. The entire region has a substantial stake in the completion of this historic development and the economic and social benefits it promises to bring to the local community. The Project has earned broad support from the Town of Paradise Valley, the City of Scottsdale, local and state officials, and community leaders who recognize its significance to Arizona's long-term growth and prosperity. As construction restarts, it will immediately reemploy hundreds of skilled tradespeople, contractors, suppliers, fabricators, and professionals—reviving a workforce that previously reached nearly 1,000 at peak activity. Upon completion, the Project is expected to generate thousands of permanent jobs, provide a durable source of tax revenue for local

municipalities and the State, and catalyze continued investment across surrounding neighborhoods. Beyond its direct economic contributions, the Project will serve as a cornerstone of Arizona's tourism and hospitality sector—enhancing the State's profile as a premier destination and delivering lasting benefits to the community and the region for years to come.

## V.   SUMMARY OF THE FIRST DAY PLEADINGS

43.   Concurrently with the filing of these chapter 11 cases, the Debtors have filed the following First Day Pleadings:

a) Debtors' Emergency Motion for Entry of an Order Directing Joint Administration of Chapter 11 Cases ("**Joint Administration Motion**"), which has been entered by the Court [Dkt. No. 10];

b) Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing Continued Use of the Debtors' Existing Cash Management System and Bank Accounts; (II) Waiving Certain United States Trustee Requirements; (III) Extending Time to Comply With Section 345(b) of the Bankruptcy Code; (IV) Authorizing Continued Performance of Intercompany Transactions; and (V) Granting Related Relief ("**Cash Management Motion**");

c) Debtors' Emergency Motion for Entry of an Order (I) Authorizing Payment of Certain Prepetition Taxes and Fees and (II) Granting Related Relief ("**Taxes Motion**");

d) Debtors' Emergency Motion for Entry of an Order (I) Prohibiting Utilities from Altering, Refusing, or Discontinuing Service; (II) Approving the Debtors' Proposed Form of Adequate Assurance of Payment to Utilities; (III) Establishing Procedures for Resolving Objections to the Debtors' Proposed Form of Adequate Assurance; and (IV) Granting Related Relief ("**Utilities Motion**");

e) Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Maintain and Renew Their Prepetition Insurance Policies and (B) Pay All Obligations in Respect Thereof and (II) Granting Related Relief ("**Insurance Motion**");

f) Debtors' Emergency Motion for Entry of an Order (I) Extending Time to File (A) Schedules and Statements and (III) Granting Related Relief (the "**Schedules Extension Motion**"); and

g) Debtors' Emergency Motion For Entry Of Interim And Final Orders (I) Authorizing The Debtors To Close Pending Real Estate Transactions And Sell Assets Free And Clear Of Liens, Claims, Encumbrances, And Other Interests And (II) Granting Related Relief ("**Real Estate Sales Motion**").

44.      Having reviewed each of the First Day Pleadings or had their contents explained to me, I believe that the Debtors would suffer immediate and irreparable harm absent the ability to continue their business operations as sought in the First Day Pleadings. In my opinion, approval of the relief sought in the First Day Pleadings is critical to the Debtors' efforts to reorganize and conduct these cases efficiently, thus permitting the Debtors to preserve and maximize value for the benefit of all stakeholders.

45.      Several of the First Day Pleadings request authority to pay prepetition claims. I am told by the Debtors' advisors that Bankruptcy Rule 6003 provides, in relevant part, that the Bankruptcy Court may not consider motions to pay prepetition claims during the first 21 days following the filing of a chapter 11 petition, "except to the extent relief is necessary to avoid immediate and irreparable harm." In light of this exception, the Debtors have limited their requests for immediate authority to pay prepetition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtors and their estates. Consequently, certain aspects of the relief sought in the First Day Pleadings will be deferred for consideration at a later hearing, as indicated therein. With respect to the other First Day Pleadings, set forth below is the reasons why I believe it is imperative that the Bankruptcy Court grant the relief requested.

## A.      Cash Management Motion

46.      In the ordinary course of business, the Debtors utilize an integrated network of bank accounts that enable the Debtors to collect, transfer, and disburse cash (the "**Cash Management System**"). The Cash Management System is essential to the efficient execution and

achievement of the Debtors' business objectives, and to maximizing the value of their estates. The Debtors primarily operate their Cash Management System through eight bank accounts at PNC Bank and AXOS Bank. The Debtors also maintain a brokerage account at Charles Schwab in the name of Debtor FSPV Res C, LLC to receive proceeds from the sale of land parcels where the estate homes will be built, a restricted account at U.S. Bank maintained by Fidelity National Title Insurance Company on behalf of Debtor Five Star Resorts Owner, LLC used to maintain funds for any construction defects related to sales of Villas, and a checking account at California Bank of Commerce ("**CBC**") in the name of Debtor Five Star Development Communities, LLC, which is designated to pay certain professional and administrative costs on behalf of the Debtors (all together with the accounts held at PNC Bank and AXOS Bank, the "**Prepetition Bank Accounts**")

47.     I understand that the Debtors seek authorization to open eleven (11) new debtor-in-possession bank accounts at CBC (the "**DIP Accounts**" and together with the Prepetition Bank Accounts, the "**Debtor Bank Accounts**") in the names of Debtors 5 Star Tech I, L.P., 5 Star Tech II-1 LP, 5 Star Tech II-4, LP, 1340 Bob Hope Drive Owner, LLC, F-Star Socorro Holding Co., LLC, JNY Building Owner, LLC, and JNY II Building Owner, LLC, Five Star Development Resort Communities, LLC, and Five Star Resort Owner, LLC, which will be used to, among other things, receive and hold sweeps of tenant receipts from Prepetition Bank Accounts into DIP Accounts, hold proceeds of the debtor-in-possession financing, and sale proceeds from the sale of Villas.

48.     Further, I understand that, the Debtors and the Non-Debtor Affiliates historically engaged in intercompany transactions with each other on a regular basis (collectively, the "**Intercompany Transactions**"). Under the Debtors' existing procedures for recording Intercompany Transactions, the Debtors would record all amounts owing between the Debtors and

the Non-Debtor Affiliates as receivables or payables. Following the Petition Date, the Debtors intend to discontinue their historical practice of routing the Debtors' funds through the Non-Debtor Operating Accounts via the Intercompany Transactions to enhance transparency, control, and efficiency in the Debtors' financial operations during these chapter 11 cases. The modified Cash Management System is designed to ensure that all funds flow exclusively through Debtor-controlled DIP Accounts and eliminate the Debtors' reliance on Non-Debtor Affiliates for the payment of operating expenses and other necessary disbursements. Accordingly, I understand the Debtors seek authority to continue such Intercompany Transactions, on an as needed basis, to enable the transition to the modified Cash Management System.

49. The Debtors permit their Banks to deduct service charges and other fees, costs, and expenses arising in the ordinary course (collectively, the "**Bank Fees**") from the Debtor Bank Accounts. As of the Petition Date, the Debtors owe Bank Fees totaling $225 to PNC. Accordingly, the Debtors seek authority to pay the outstanding Bank Fees due to PNC and any other Bank Fees that become due in the ordinary course.

50. The Debtors' ability to continue using the Cash Management System and Debtor Bank Accounts during these chapter 11 cases is essential to maintaining the Debtors' businesses and maximizing the value of their estates. The Cash Management System is designed to reduce the administrative burden on the Debtors by facilitating the movement of funds among and across all Debtors. The Debtors have proposed modifications to the Cash Management System that will enhance the Debtors' control and visibility over their accounts. Requiring the Debtors to implement an entirely new cash management system would be expensive, onerous, and disruptive.

51.     Accordingly, the relief requested in the Cash Management Motion is necessary to avoid immediate and irreparable harm and is in the best interests of the Debtors' estates, their creditors, and all other parties in interest.

**B.     Taxes Motion**

52.     The Debtors seek entry of an order authorizing the Debtors, in their discretion, to pay prepetition property taxes, gross receipts taxes, and all other similar obligations, including any related penalties and interest (collectively, the "**Prepetition Taxes and Fees**"), to various state and local authorities (collectively, the "**Authorities**") as such Prepetition Taxes and Fees come due in the ordinary course. The Debtors incur various tax liabilities and fees, including late fees and other ancillary costs that they have generally paid to the relevant Authority when due in the ordinary course of business. I understand that the Debtors estimate that approximately $5,100,000 in Prepetition Taxes and Fees will become due and payable following the Petition Date.

53.     *Real Property Taxes*. The Debtors incur taxes related to their real property holdings, payable on an annual and bi-annual basis to the applicable Authority. The Debtors typically pay their property taxes in the ordinary course as such taxes are invoiced. In El Paso County, Texas, property tax bills are issued in October each year and are due by January 31 of the following year, becoming delinquent after February 1. In Maricopa County, Arizona, property tax bills are issued in September, with the first half payment due October 1 (delinquent after November 1) and the second half payment due March 1 (delinquent after May 1). The Debtors estimate that as of the Petition Date, approximately $4,850,000 in real property taxes will become due and payable in the ordinary course of business during the postpetition period.

54.     *Gross Receipts Taxes*. The Debtors operations in Texas are subject to the Texas Franchise Tax, a margin-based tax on gross receipts that is self-assessed and due annually

on May 15 to the Texas Comptroller of Public Accounts. The Debtors estimate that as of the Petition Date, approximately $250,000 in gross receipts taxes will become due and payable in the ordinary course of business during the postpetition period.

55.     The Debtors' ability to pay Prepetition Taxes and Fees is critical to their continued and uninterrupted operations and would ultimately preserve the resources of the Debtors' estates and going-concern values. It is my understanding that if the Debtors do not make timely payments, they will have to spend time and money resolving a multitude of issues related to these obligations, including whether (i) the obligations are priority, secured, or unsecured; (ii) the obligations are proratable or fully prepetition or postpetition; and (iii) penalties, interest, attorneys' fees, and costs accrue on a postpetition basis, and if so, whether the penalties, interest, attorneys' fees, and costs are priority, secured, or unsecured. The Debtors justifiably want to avoid these unnecessary potential disputes.

56.     Accordingly, the relief requested in the Taxes Motion is necessary to avoid immediate and irreparable harm and is in the best interests of the Debtors' estates, their creditors, and all other parties in interest.

**C.     Utilities Motion**

57.     The Debtors seek entry of an order (i) prohibiting utilities, as that term is used in section 366 of the Bankruptcy Code ("**Utility Companies**"), from altering, refusing, or discontinuing services to, or discriminating against, the Debtors solely on the basis of the commencement of the Debtors' chapter 11 cases, a debt owed by the Debtors for services rendered before the Petition Date, or any perceived inadequacy of the Debtors' proposed adequate assurance of payment to Utility Companies for postpetition services; (ii) approving the Debtors' proposed adequate assurance of payment to Utility Companies for postpetition services; and (iii) approving

procedures for resolving objections to the Debtors' proposed adequate assurance of payment to Utility Companies for postpetition services (the "**Adequate Assurance Procedures**").

58.     In the ordinary course of business, the Debtors buy electricity, gas, water, refuse, security monitoring, and internet/phone services (collectively, the "**Utility Services**") from Utility Companies to operate their businesses. I understand that, on average, the Debtors pay approximately $124,000.00 per month for Utility Services.

59.     I anticipate that the Debtors will have sufficient cash on hand to timely pay in full, in cash, all undisputed postpetition obligations owed to Utility Companies during these chapter 11 cases. I understand that the Proposed Adequate Assurance Procedures are customary and provide Utility Companies with adequate assurance of payment, and I do not believe that other or further assurances of payment to Utility Companies for postpetition Utilities Services are necessary. However, I understand that the Debtors have also proposed procedures to resolve requests for additional or alternative assurance of payment in an orderly and fair manner.

60.     Preserving Utility Services on an uninterrupted basis is essential to the Debtors' ongoing operations and, therefore, to the success of these cases. Indeed, any interruption in Utility Services, even for a brief period, would disrupt the Debtors' ability to continue operations. Given the Debtors' need to receive uninterrupted Utility Services, the relief requested fairly balances Utility Companies' rights and the Debtors' rights under the Bankruptcy Code. Accordingly, the Utility Companies will not be prejudiced by either the proposed adequate assurance or the requirement to provide the Debtors with uninterrupted service.

D.     **Insurance Motion**

61.     The Debtors seek entry of an order authorizing the Debtors, in their discretion, to (a) maintain, supplement, amend, extend, renew, or replace their Insurance Policies,

26

(b) pay any obligations, whether arising before or after the Petition Date, related to the Insurance Policies, including premiums, deductibles, assessments, true-up amounts, broker fees, administrative fees, Premium Financing Obligations, and other related fees and costs (collectively, the "**Insurance Obligations**") as such obligations become due in the ordinary course, and (c) maintain their Premium Financing Program and enter into new premium financing arrangements, and (ii) granting related relief.

62.     The Debtors maintain approximately twenty one Insurance Policies through a variety of insurance carriers. The Insurance Policies are tailored to protect the Debtors against the risk inherent to operation of the Debtors' real estate portfolio. Among other things, the Insurance Policies provide the Debtors with commercial property insurance, builder's risk insurance, and pollution liability insurance. The Debtors also maintain multiple general liability policies, which provide, among other things, automobile liability coverage, commercial general liability coverage, employee theft coverage, umbrella liability coverage, and excess liability coverage. Additionally, the Debtors maintain a directors and officers liability insurance policy, which includes tail coverage that remains in effect following the policy period. I understand that, on average, the annual premiums due under the Insurance Policies total approximately $3.9 million. As of the Petition Date, the Debtors do not believe that any amounts remain outstanding on account of premiums under the Insurance Policies.

63.     The Debtors also incur various obligations in connection with its Insurance Policies. For instance, generally, the Debtors obtain the Insurance Policies through their broker, Marsh & McLennan Agency LLC (the "**Insurance Broker**"). The Insurance Broker assists the Debtors in obtaining comprehensive insurance coverage for their operations in the most cost effective manner and providing ongoing support throughout the applicable policy periods.

64. Additionally, the Debtors have obligations under its Premium Financing Program. The Debtors believe that, where feasible, it is economically beneficial to finance their premiums rather than pay them in a lump-sum. Accordingly, the Debtors currently finance the premium obligations for certain of their Insurance Policies (the "**Premium Financing Program**") pursuant to financing agreements (collectively, the "**Premium Financing Agreements**") with various financing companies, including First Insurance Funding, a division of Lake Forest Bank & Trust Company, N.A. The Debtors' obligation to pay the financed amounts under the Premium Financing Agreements is secured by a first priority lien on and security interest in the financed policies and any additional premiums required under the financed policies. The Premium Financing Companies also have the right to cancel the financed Insurance Policies if the Debtors default on their payment obligations. As of the Petition Date, the Debtors have paid approximately $3.3 million in premium payments under the Premium Financing Program.

65. Given this backdrop, the Debtors believe that it is essential to their estates, that they maintain and continue to make all required payments under their Insurance Policies and to have the authority to maintain, supplement, amend, extend, renew, or replace these policies as needed, as any lapse in coverage could leave the Debtors exposed to significant liability.

66. Likewise, failure to maintain the Premium Financing Program and pay other related insurance expenses will harm the Debtor's estate in several ways, as under the Premium Financing Agreements, the Premium Financing Companies maintain a security interest in unearned or returned premiums related to the financed insurance policies and, as secured creditors, could be entitled to cancel the insurance policies in accordance with the terms of the Premium Financing Agreements.

67.     Accordingly, the relief requested in the Insurance Motion is necessary to avoid immediate and irreparable harm and is in the best interests of the Debtors' estates, their creditors, and all other parties in interest.

### E.     Schedules Extension Motion

68.     The Debtors seek entry of an order extending the deadline to file their schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases, and statements of financial affairs (collectively, the "**Schedules and Statements**") in their chapter 11 cases. The Debtors seek an additional forty-five days, for a total of fifty-nine days from the Petition Date, to complete these filings, given the size and complexity of their businesses, the volume of information required, and the need to ensure accuracy and completeness. The Debtors believe that the extension will not prejudice creditors or other parties in interest, as the Schedules and Statements will still be filed before any deadline for filing proofs of claim. Accordingly, cause exists for the extension under section 521 of the Bankruptcy Code and Bankruptcy Rule 1007(c) and courts routinely grant such relief in cases such as this.

### F.     Real Estate Sales Motion

69.     The Debtors seek entry of interim and final orders (i) authorizing  the Debtors,  in  their  discretion, to carry out the closing of pending real estate transactions and sell assets free and clear of liens, claims, encumbrances, and other interests and (ii) granting related relief.

70.     The Project includes the construction and sale of the eighty (80) Ritz-Carlton-branded, resort-integrated Villas. The Villas constitute a critical aspect of the Project, as they establish a year-round presence that will enhance the performance of the nearby Ritz-Carlton

resort hotel and the luxury retail, dining, and experiential district on the resort. I understand that during a single residential release in 2016, all eighty (80) Villas were pre-sold within a matter of days, generating approximately $250 million in purchase commitments. Vertical construction of the Villas commenced in 2018 and continues today.

71.     I understand that as of the Petition Date, there are (a) forty-four (44) Villas that have closed and are fully occupied by residents, (b) twenty-nine (29) Villas that are currently under contract for sale to third-party buyers and are yet to close (the "**Pending Transactions**"), and (c) seven (7) Villas that were previously under contract, but those contracts have since been terminated (the "**Future Sales**").  My understanding is that the Pending Transactions and Future Sales are expected to generate at least $124,00,000 in net sale proceeds. I further understand that a number of the Pending Transactions are scheduled to close in November, including several closings that are expected to occur within a week of the Petition Date. It is my understanding that the remaining Villas that are subject to Pending Transactions are in varying stages of construction, many of which are near completion.

72.     As evidenced by the dozens of Villas that have successfully closed, it is my understanding that closing transactions of this exact nature is in the ordinary course of business for the Debtors and would be beneficial to the Debtors' estates and their creditors. Still, out of an abundance of caution, the Real Estate Sales Proceeds Motion seeks Court authorization to close the Pending Transactions and enter into and close Future Sales free and clear of any liens, claims, encumbrances, and other interests.

73.     Consummating the Pending Transactions and any Future Sales on the terms set forth in the applicable Villa Agreements is a sound exercise of the Debtors' business judgment. The sales of the Villas were negotiated and agreed to prepetition in the ordinary course of the

Debtors' business. Proceeding to close in accordance with the Villa Agreements maintains the Debtors' credibility, trust, and goodwill with the Buyers and other potential business partners, which is critical to the Debtors' ongoing ability to transact efficiently and maximize value in these cases. If the requested relief is denied, the pending closings will need to canceled, which could lead to Buyers terminating their Villa Agreements (as some Buyers have already done). Moreover, any delay will materially impair the Debtors' ability to successfully close Future Sales, particularly given that the Debtors are entering the peak Arizona weather and real estate season

74.     It is my understanding that to the extent there are any parties with valid and perfected liens in the Villa sales proceeds, such parties will be adequately protected by having their liens attach to the sale proceeds, subject to any claims and defenses that the Debtors may have with respect thereto. I believe that this puts any valid lienholders in a nearly identical position to the one they were in prior to the sale of the Villas.

75.     The Debtors believe that each of Buyers are bona-fide purchasers who negotiated these transactions at arm's length, for fair value, and in good faith. It is my understanding that the Pending Transactions represent the market value of the Villas achieved through the residential release held in 2016, which was open to the public. I am unaware of any evidence of fraud, misrepresentation, or misconduct with respect to the sales of the Villas. Accordingly, the Debtors believe the Buyers should be expressly found to have acted in good faith within the meaning of section 363(m) of the Bankruptcy Code and entitled to the statutory protections thereunder.

76.     Accordingly, the relief requested in the Real Estate Sales Motion is necessary to avoid immediate and irreparable harm and is in the best interests of the Debtors' estates, their creditors, and all other parties in interest.

## <u>CONCLUSION</u>

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing

is true and correct to the best of my knowledge and belief.


Dated:  November 5, 2025
        Los Angeles, California

                                        */s/ Lance Miller*
                                        _____

                                        Lance Miller
                                        Chief Restructuring Officer